682 P.2d 571

STATE of Idaho, Plaintiff-Respondent,

v.

Juanita IWAKIRI, Defendant-Appellant.

No. 14316.

Supreme Court of Idaho.

May 7, 1984.

R.D. Toothman, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

On March 30, 1977, Brandi Summers and Tiffany Wise disappeared from their home in San Bernardino, California, after their mother, Beverly Wise, was murdered. The older girl, Brandi, was the natural daughter of Beverly and her first husband, Roy Summers, while Tiffany was the daughter of Beverly and Claude Wise, Beverly's husband at the time of the murder.

The girls and Roy Summers were subsequently sighted in various locations in Nevada and the southwest. In 1980 a Garden City resident positively identified Brandi as having been in Boise from viewing a picture that investigators ran in The Idaho Statesman. Further investigation revealed witnesses who could place both girls in the care of appellant and led ultimately to appellant's arrest in Boise in 1980.

At appellant's trial on kidnapping charges the testimony of Rebecca Boyer was presented. Boyer had been hypnotized twice prior to trial in order to refresh her memory. The first hypnosis session was conducted by a detective with the Boise Police Department. Also present at that session were Boyer's attorney, Robert Aldridge, another detective, two investigators, an operator and recorder. Defense counsel was aware of the session, part of which was tape recorded. The second session took place shortly before trial at the Boise Hypnosis Center and was conducted by a Dr. Streib. The existence of a second hypnosis session was not revealed during discovery.

The key portion of Boyer's testimony consisted of an account of having seen the two missing children in appellant's home. She also testified to seeing a man, later identified as Roy Summers, in the house.

The testimony of attorney Robert Aldridge, who was under subpoena, was also presented at trial. In 1977 Boyer had referred appellant to Aldridge, and on two occasions in the summer of 1977 appellant had contacted Aldridge by phone to talk to him about adoption questions she had. Both conversations resulted in Aldridge informing appellant that he could not or would not take her case. Preparatory to trial, Aldridge and appellant had a third conversation wherein she told him to tell her defense attorney, Mr. Wyman, anything Wyman wanted to know. At trial, the judge ruled that the 1977 communications between appellant and Aldridge were privileged communications, but the privilege had been waived. Aldridge was ordered, over the objection of appellant, to testify to the content of the two conversations.

Appellant was convicted of second degree kidnapping and sentenced to an inde-

terminate term of five years. She was granted probation after four months and her conviction was later reduced to a misdemeanor.

On appeal, appellant contends that the trial court erred in two respects: (1) by admitting the testimony of a witness who had been hypnotized to refresh her recollection; and (2) by ruling that appellant had waived her attorney client privilege and allowing the testimony of Robert Aldridge to be admitted. We will consider the latter allegation first.

## I. WAIVER OF ATTORNEY–CLIENT PRIVILEGE

■ The trial court was correct in ruling that the 1977 phone conversations between appellant and Aldridge were privileged. Communications between attorney and client made in the course of professional employment are protected by the attorney-client privilege. I.C. § 9–203(2). The privilege extends to communications made with a view toward employing the attorney by a potential client, whether or not actual employment results. *People v. Squitieri*, 49 A.D.2d 374, 375 N.Y.S.2d 124 (1975); *see also Com. v. O'Brien*, 377 Mass. 772, 388 N.E.2d 658 (1979). The trial court's ruling that the privilege had been waived, however, was erroneous. I.C. § 9–203(2) provides that an attorney cannot be examined regarding confidential communications made in the course of employment "without the consent of his client." The statute thus makes it clear that the client is the holder of the privilege. Accordingly, only the client can waive the privilege. The only possible ground for waiver in the instant case arises from appellant's directions to Aldridge that he tell Wyman, her defense attorney, anything Wyman wanted to know. Her obvious purpose was to ensure that Wyman was as well prepared as possible for her trial. As such, the communications remained privileged. It is well established that communications between attorneys for the same client are protected by the attorney-client privilege in the absence of any showing of waiver. *See* Annot., Attorney-Client Privilege As Affected By Communications Between Several Attorneys, 9 A.L.R.3d 1420, 1424 (1966). There being nothing to indicate that appellant intended to waive the privilege, the subject communications were protected.

■ The improperly admitted testimony was highly prejudicial. Aldridge testified that he responded to appellant's statement that she had an adoption question she wanted to ask, by the following statement:

"Wait a second. I don't handle black market or under-the-counter types of adoptions. I will handle them if they are health and welfare type of adoption or if there is some religious or other organization involved that has a child, but I don't take things under the counter, next of kin or otherwise." Tr., p. 1617, lines 16–22.

It was not until sometime after he completed that statement that he turned down potential employment by appellant.[1] It was therefore within the scope of the attorney-client privilege and should not have been admitted. Its prejudicial effect is obvious and mandates reversal of the conviction. *See State v. Goodrich*, 97 Idaho 472, 546 P.2d 1180 (1976); *State v. White*, 97 Idaho 708, 551 P.2d 1344 (1976), *cert. den.* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111.

## II. ADMISSION OF HYPNOTICALLY REFRESHED TESTIMONY

Appellant also assigns as error the admission of the testimony of a witness whose memory was hypnotically refreshed. Because we reverse this case for a new trial, we must give the trial court some direction on the admissibility of hypnotically refreshed testimony. This is an issue that has received a great deal of attention in recent years, in both law review articles and judicial opinions. *See, e.g.*, Beaver, Memory Restored or Confabulated by Hyp-

---

1. Any communication between Aldridge and Iwakiri subsequent to his refusal to handle her case falls outside the scope of the privilege and is admissible. *Farley v. Peebles*, 70 N.W. 231 (Neb.1897); *McGrede v. Rembert Natl. Bank*, 147 S.W.2d 580 (Tex.Civ.App.1941); 8 Wigmore, Evidence, § 2304 (1961 ed.).

nosis—Is it Competent? 6 Univ.Puget Sound L.Rev. 155 (1983); Falk, Post-hypnotic Testimony—Witness Competency and the Fulcrum of Procedural Safeguards, 57 St. John's L.Rev. 30 (1982); Testimony by Previously Hypnotized Witnesses: Should It Be Admissible? 18 Idaho L.Rev. 111 (1982); Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Cal.L.Rev. 313 (1980). *See also, People v. Gonzales,* 415 Mich. 615, 329 N.W.2d 743 (1982); *State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500 (1983); *State v. Brown,* 337 N.W.2d 138 (N.D. 1983); *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386 (1983).

The issue presented in this case is: Does the fact that a witness has been hypnotized prior to trial to refresh memory render that witness incompetent to testify? This is a question of first impression in this jurisdiction and requires our considered analysis.

The basic issue presented is one of competency of a hypnotized witness. We begin our analysis by noting the evolution of the general rule on competency of witnesses. At early common law, certain witnesses were deemed to be incompetent *per se* merely because they were included in a certain group of persons. Groups which were commonly disqualified as witnesses included those holding certain religious beliefs, persons deemed to be insane, persons convicted of a crime, and persons of immature age. Later, these rules were modified in favor of a general rule of competency, giving to the jury the duty of judging the credibility of witnesses. However, some *per se* disqualification exceptions were retained, for example, the disqualification of children as competent witnesses. *See* I.C. § 9–201; I.C. § 9–202.

The recently adopted Federal Rules of Evidence, applicable in the federal courts,

provide a further example of the continued evolution of a general rule of competency by establishing a rule which reads, "Every person is competent to be a witness except as otherwise provided in these rules." Federal Rule of Evidence 601. The rule then provides an exception only for judges and jurors participating in the trial at hand. The commentary to Federal Rule 601 states, "A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." [2] Thus, the trend of the law in other jurisdictions in favor of a general rule of competency, which leaves to the discretion of the trial court the determination of whether circumstances render the witness incompetent, has been evolving over the last century, resulting in rejection of any *per se* rule of incompetency. The evolution is based upon the premise that *per se* rules which disqualify witnesses with knowledge of facts pertinent to the case are serious obstructions to the ascertainment of truth, the ultimate goal in our legal system. *See* McCormick, Evidence, § 71, p. 150 (1972).

On the other hand, there are a number of generally recognized problems with hypnotically induced testimony. In the early experience with hypnosis it was the general belief, as a basic underlying assumption of the use of hypnosis, that memory was similar to a videotape machine, in that it merely recorded the perceptions of the viewer and stored them away for recall, which could be enhanced through the use of hypnosis. More recent studies suggest, however, that this may well be a fallacious assumption. One contemporary developing view of the way the memory reacts to hypnosis is best

---

2. The rules also allow for exceptions allowed under substantive state law, *i.e.,* the Dead Man's Statutes. *See* F.R.E. 601. The proposed Idaho Rule of Evidence also creates a general rule of competency, but sets up a procedure allowing for the trial court to determine incompetency.

"Every person is competent to be a witness except:

"(a) Incompetency determined by court. Persons whom the court finds to be incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly." Proposed Idaho Rules of Evidence 601.

explained in *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981).

"It is generally agreed that hypnosis is a state of altered consciousness and heightened suggestibility in which the subject is prone to experience distortions of reality, false memories, fantasies and confabulation (the 'filling in of memory gaps with false memories or inaccurate bits of information')." *Id.* 624 P.2d at 1276.

However, the videotape theory is still relied upon by those adhering to the "investigative hypnosis" school of thought, such as Dr. Martin Rieser, Director of the Law Enforcement Hypnosis Institute, the vehicle through which many law enforcement officers receive their training in hypnotism.

When a subject is hypnotized, especially a witness to a crime eager to aid in solving the crime, both schools of thought agree that the subject is especially vulnerable to suggestions and/or "cueing" from the hypnotist.

"The hypnotized subject may respond to implicit stimuli unintentionally emanating from the hypnotist, and unrecognized by him. The desire to please the hypnotist may induce the subject to mirror the attitude detected in the hypnotist's questions and his behavior." Spector & Foster, Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible? 38 Ohio St.L.J. 567, 578 (1977).

A subject may also confabulate, *i.e.,* fill in the blanks in his or her memory, in an effort to answer questions posed by the hypnotist. When asked by the hypnotist to "imagine you are there," the subject may sometimes do just that: "imagine."

Another perceived problem is that when a subject awakens from the hypnotic trance, he or she often believes that distortions in memory due to cueing and confabulation are a part of his or her own memory. This phenomenon allegedly makes it difficult to determine what is "true memory" and what is "false memory." It is for these reasons, among others, that the question of admissibility of hypnotically induced testimony has become such a difficult one.

The courts which have addressed this problem have generally taken three separate approaches in determining the admissibility of hypnotically induced testimony. The first approach is a *per se* rule of inadmissibility. That approach is well represented by the case of *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (1982). Cases adopting this approach generally base their rationale on an extension of what is known as the *Frye* rule, taken from *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The *Frye* rule "conditions the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed." *People v. Shirley, supra* 641 P.2d at 784. Cases applying the *Frye* approach generally hold that hypnosis has not been shown to have been generally accepted as reliable in scientific community. Thus, they adopt a rule that, until hypnosis is generally accepted by the scientific community, a witness whose testimony has been hypnotically enhanced is not competent to testify. *See also Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982); *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981); *Commonwealth v. Juvenile*, 381 Mass. 727, 412 N.E.2d 339 (1980); *People v. Gonzales, supra; State v. Mack*, 292 N.W.2d 764 (Minn.1980). However, some of the courts that have adopted the *per se* rule still allow a witness to testify to facts recalled prior to hypnosis. *See Collins v. Superior Court, supra; State v. Patterson, supra; People v. Gonzales, supra.*

Another approach is to rule that such testimony is always admissible, not incompetent, and the fact that a witness may have been hypnotically manipulated merely goes to the credibility and weight of the testimony, and as such is an issue for the jury to decide. *See State v. Brown*, 337 N.W.2d 138 (N.D.1983); *Chapman v. State*, 638 P.2d 1280 (Wyo.1982). Again, this line of cases establishes a *per se* rule, albeit a rule of admissibility as opposed to inadmissibility.

The third line of authority allows for the admissibility of hypnotically induced testimony if certain safeguards are followed to ensure the reliability of the testimony. *See State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981); *State v. Beachum*, 97 N.M. 682, 643 P.2d 246 (App.1981); *People v. Lewis*, 103 Misc.2d 881, 427 N.Y.S.2d 177 (1980). The safeguards often relied on in these cases are safeguards developed by Dr. Martin Orne, an expert in hypnotically induced testimony. These safeguards are:

"(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis.

"(2) The qualified professional conducting the hypnotic session should be independent of and not responsible to the prosecutor, investigator or the defense.

"(3) Any information given to the hypnotist by law enforcement personnel prior to the hypnotic session must be in written form so that subsequently the extent of the information the subject received from the hypnotist may be determined.

"(4) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding adding any new elements to the witness' description of the events.

"(5) All contacts between the hypnotist and the subject should be recorded so that a permanent record is available for comparison and study to establish that the witness has not received information or suggestion which might later be reported as having been first described by the subject during hypnosis. Videotape should be employed if possible, but should not be mandatory.

"(6) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview." *State v. Hurd*, 432 A.2d at 89–90.[3]

This line of cases can also be interpreted as a *per se* rule in that the cases seem to imply that if the safeguards proposed are followed, the testimony is admissible; but if the safeguards are not followed the testimony is inadmissible.

While each of the three approaches discussed above have merit, they all advocate to a greater or lesser extent a *per se* rule of admissibility or inadmissibility which is inconsistent with the general trend of witness competency that every person is competent to be a witness. While each of the three approaches focuses on an important consideration to be evaluated by a trial court in determining competency, they do so to the exclusion of other considerations, and thus unnecessarily tie a trial court's hands in determining the competency of a witness to testify. If we were to adopt the rule that hypnotically induced testimony should be left to cross examination and impeachment, there would still be circumstances where testimony admitted under that rule had been rendered tainted and unreliable due to the methods used in hypnosis. Thus, a *per se* rule of admissibility would in some circumstances allow for the admission of unreliable testimony, an undesirable result in our judicial system, where we strive to reach verdicts based only on reliable testimony. On the other hand, a *per se* rule of inadmissibility, such as that discussed above, would, in some circumstances, disallow reliable testimony, thus thwarting the truthseeking function of our judicial system. Finally, the third line of authority adopting safeguards to be used in hypnotic sessions, could also represent a *per se* rule if it were interpreted to mean that, if the safeguards were followed, the testimony is always admissible, and if the safeguards were not followed the testimony is never admissible. We foresee circumstances where, even when the safeguards are not strictly or entirely followed, a trial court could nevertheless conclude that the

---

**3.** Some cases have also adopted a modified and expanded version of the six safeguards developed by Dr. Orne, adding requirements that the witness be examined prior to hypnosis to detect possible mental illness and assure that the wit-

ness possesses judgment and comprehension of the process, and that consideration be given to evidence corroborating or challenging information elicited during hypnosis. *See People v. Lewis*, 103 Misc.2d 881, 427 N.Y.S.2d 177 (1980).

testimony would still be sufficiently reliable for its admission. For example, one of the safeguards proposed by Dr. Orne is that only the hypnotist and the subject should be present during any phase of the hypnotic session. However, strict compliance at all times with this safeguard would prevent a criminal defendant from seeking the self protection of the presence of his attorney, or even prevent a person from requesting that his or her own psychiatrist be present to observe the session. In this case, the presence of a third person would protect the rights of a subject, but at the same time would not necessarily render the entire testimony unreliable. Thus, merely because one of the safeguards was not followed should not result in the automatic exclusion of the entire testimony.

▮▮▮ Accordingly, we adopt our own rule on the admissibility of hypnotically induced testimony, rejecting each of the *per se* rules set out above. We adopt this rule with the intent of giving guidance to trial judges grappling with the difficult question of the admissibility of hypnotically induced or enhanced testimony. There needs to be some method of determining the admissibility of this type of testimony that will protect against the dangers of hypnosis, particularly the dangers of cueing and confabulation, and yet allow for receipt of the benefits of memory recall which hypnosis can produce. Thus, we adopt a rule wherein trial courts are directed, in cases where hypnosis has been employed, to conduct pretrial hearings on the procedures used during the hypnotic session in question. Trial judges should then apply a "totality of the circumstances" test and make a determination whether, in view of all of the circumstances, the proposed testimony is sufficiently reliable to merit admission. If the witness's memory seems to have been altered in such a way as to render it unreliable, the trial court may rule the witness to be incompetent. We feel that some safeguards should be outlined to give trial courts guidance on what elements they should look for in applying this test. We adopt the following modified

version of the Orne safeguards, for the general guidance of the trial courts.

(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis and thus aware of its possible effects on memory, so as to aid in the prevention of cueing and improper suggestion.

(2) The person conducting the session should be independent from either of the parties in the case.

(3) Information given to the hypnotist by either party concerning the case should be noted, preferably in written form, so that the extent of information the subject received from the hypnotist may be determined.

(4) Before hypnosis, the hypnotist should obtain a detailed description of the facts from the subject, avoiding adding new elements to the subject's description.

(5) The session should be recorded so a permanent record is available to ensure against suggestive procedures. Videotape is a preferable method of recordation, but not mandatory.

(6) Preferably, only the hypnotist and subject should be present during any phase of the hypnotic session, but other persons should be allowed to attend if their attendance can be shown to be essential and steps are taken to prevent their influencing the results of the session, (*i.e.*, they are not allowed to participate in the session, etc.).

This "totality of the circumstances" rule should be applied whether the hypnotized witness is produced by the plaintiff or defendant.

▮▮▮ The rule we set out today is a rule of competency, not an exclusionary rule intended to punish one side or another for some perceived misconduct in the manner in which the hypnosis was conducted, such as the exclusionary rule in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), or *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

This rule will bring this evidentiary problem in line with other problems of a similar nature. The process of hypnosis, which

sometimes results in a modification of memory, is not the only subsequent event that could serve to modify memory and render it untrustworthy. *See* F. Frankfurter, The Case of Sacco and Vanzetti (1927) ("The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials."), as quoted in Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness identification, 29 Stan. L.Rev. 969–1030 (1977) (many variables affect perception of events and may result in distortion of memory). An idle conversation with another witness to the same occurrence can, according to some of the experts, lead to a modification of a witness's memory. While the possibility of alteration of memory through the use of hypnosis is much greater than in other subsequent events, the question is only one of degree. Thus, placing this hypnosis evidentiary problem within the control of the trial court assures that reliability will be determined before submission of the evidence to the jury, just as in other cases where evidentiary problems are presented. Our rule today also gives control over this question to the entity most experienced in dealing with evidentiary questions, the trial court.

 We should also note that in the event a trial court finds that, as a result of a hypnotic session, a witness's testimony on particular matters has been tainted, and the witness has thus been rendered incompetent on those matters, the trial court may determine that the witness is still competent to testify in areas where the witness's recollection is unmarred by the hypnotic sessions. This may or may not be limited to situations where it is clear that certain parts of a witness's memory of events was in existence before hypnosis and thus is still in existence, untainted, after the hypnotic session. To determine the possible existence of untainted testimony of this type, the trial court can examine statements of the witness, made prior to hypnosis, and any videotapes or recordings of the hypnosis sessions themselves. If certain areas were not covered, the trial court may well determine that the witness remains competent to testify to those matters. *See Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982) (even under *per se* rule, hypnosis does not render witness incompetent to testify to facts demonstrably recalled prior to hypnosis).

 A witness who has the ability to observe, perceive and testify accurately should be allowed to testify to those facts relevant to the case at hand. With that general principle in mind, trial courts considering the question of admissibility of hypnotically induced testimony should examine the circumstances surrounding the hypnotic session, keeping in mind the safeguards previously mentioned and determine if, in the totality of the circumstances, it appears that the testimony proposed is sufficiently reliable to merit admission. We note that it would be an unusual case where admission of the testimony would be allowed where none of the safeguards mentioned were followed. It would also be an unusual case if all of the mentioned safeguards were followed, but the trial court nevertheless ruled that the witness was still not competent to testify. Upon retrial of this case, the trial court should determine the admissibility of the hypnotized witness's testimony using the guidelines set forth herein.

 Because the rule we set out is a rule of competency, once the determination of competency is made the witness should testify on direct examination as to his or her present recollection without indicating the fact of hypnosis. A witness should not be able to buttress his testimony by stating that his present recollection resulted from his or her hypnosis any more than a witness may buttress his direct testimony by testifying that he has made the same statements on a lie detector test and has passed the test. *Cf. Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). If a party wishes then to impeach the competency of the witness who has been hypnotized because of the

fact of hypnosis, or because of an inconsistent prehypnosis statement, he may cross examine concerning the hypnosis, and both parties may then bring in experts to testify to the dangers and benefits of hypnosis as rebuttal of the other party's assertions, which experts can then also be rebutted.

Reversed.

DONALDSON, C.J., and McFADDEN, J., Pro Tem., concur.

SHEPARD, J., dissents as to Part I, without opinion, and concurs as to Part II.

BISTLINE, Justice, concurring and dissenting.

I. **The attorney-client privilege.** I agree that the testimony of Mr. Aldridge was prejudicial to the defendant's case. Not only was there the testimony set out in the majority opinion, but the further statement by Mr. Aldridge that in informing her of problems she would encounter in attempting to adopt the children that he "wouldn't touch it with a ten foot pole for a million dollars." Tr., p. 1625. The prejudice inherent in such remarks, which seem to have the flavor of voluntariness, is self-evident and unneedful of discussion. It was Mrs. Iwakiri who was on trial, not Mr. Aldridge. The trial court's ruling made her statements to Mr. Aldridge admissible against her. I fail to see how Mr. Aldridge's declaration of his office policy can be in any way attributed to her.

Although the majority opinion seems to intimate that the State is contending that Mrs. Iwakiri's instructions to Mr. Aldridge that he fully discuss their conversation to Mr. Wyman amounted to a waiver, I do not so read the State's brief. As to waiver, the State merely declares that the trial judge found such, but suggests no basis for that finding.

Citing *People v. Canfield*, 12 Cal.3d 699, 117 Cal.Rptr. 81, 527 P.2d 633 (1974), as authority for the statement, the State's brief concedes that Where a Person Seeks the Assistance of an Attorney with a View to Employing Him Professionally, Any Information Acquired by the Attorney is

Privileged Whether or Not Actual Employment Results. P. 7. In the argument portion of the State's brief, the contention is advanced, however, that "communications made after the potential client has been informed by the attorney that he or she will not accept employment in the case are not within the letter or the spirit of the statutory or common law attorney-client privilege and thus are not privileged." P. 13. The State argues "that the communications were not privileged because they were received from Iwakiri after Aldridge informed Iwakiri that he would not accept employment in the case," but that "Iwakiri continued to talk with Aldridge"—on which basis the State's brief urges upon us "that the testimony of Aldridge establishes that Iwakiri was informed very early on that Aldridge would not act as her attorney. Despite this, Iwakiri provided Aldridge with additional information." Pp. 14–15.

The record in this case consists of 25 volumes. This Court has the right to rely upon statements in the briefs of counsel where the representation is made that those statements are substantiated by the record, and citations to the record are made in the brief. The statement in the State's brief telling us that "the communications to which Aldridge testified at trial ... were received from Iwakiri after Aldridge informed Iwakiri that he would not accept employment in the case" has no substantiation in the record. It is far from supported by his prefatory remark to her that he did not handle black market or under-the-counter types of adoptions, the excerpt of which is set out in the majority opinion. The truth of the matter is that Aldridge did not so decline to handle an adoption for her until the interview had been fully concluded.

Other than for the fact one member of the Court thought it important to ascertain *exactly* at what point Mr. Aldridge informed Mrs. Iwakiri that he would not represent her, a decision in this case, erroneous in this respect, would have gone out based upon our acceptance of the State's argument that the entire conversation took

place with Mrs. Iwakiri continuing to unfold her entire story to Mr. Aldridge after he had told her that he would not be her attorney on the proposed adoption, which was the only thing she had in mind when she called on him to obtain his services. Aldridge did not testify that "early on" he refused to represent her, but to the prosecutor's question "So you didn't accept this case at that point," answered only that he had not—*at that point*, that point being prior to his having any information whatever other than that she, a potential client, was calling about a prospective adoption. Aldridge's testimony established that the conversation continued, there having been no mention made in it of his declaring himself unavailable, so that he could get the facts and advise her. He scotched the idea of an adoption but did advise her, *after* hearing her out. As Paul Harvey says, here is the rest of the story:

"Q. And can you tell the jury how it is this contact with the defendant came about?

"A. The phone call came into my office. I answered the phone; I don't believe there was a secretary in between on that. And a person on the other end said, 'This is Tiny Iwakiri. Becky Boyer recommended me to you or referred me to you. Has she told you about me?'

"Q. What did you say?

"A. I said no, she had not. The person then said, 'Well, I have got an adoption question I wanted to ask you about.' I then said, 'Wait a second. I don't handle black market or under-the-counter types of adoptions. I will handle them if they are health and welfare type of adoption or if there is some religious or other organization involved that has a child, but I don't take things under the counter, next of kin or otherwise.'

"Q. Did the defendant make any statements to you after you had told her that?

"A. Yes. She responded, 'No, that is not what I'm talking about. The children are already here. They are my sister's—' I believe she said they were two girls. I

think that she said that they were ages two and five but I am not totally sure about that.

"Q. Did you question her further about this adoption?

"A. *I then told her it was office practice* based on some past occurrences that I had been involved in and I had heard about with other attorneys *to always investigate a case a little further if I decided I would take it.*

"Q. So you didn't accept this case at that point?

"A. No.

"Q. You didn't accept employment?

"A. No. Further I told her there were times when you didn't always have to have an attorney, *that it may turn out there's nothing could be done; she didn't need an attorney. So we should examine that situation further before we did anything.*

"Q. Did you question her further or did she volunteer information at that point?

"A. At that point in time I remarked to her that it sounded like a messy situation with the sister involved. And she then stated, well, they weren't really the sister's children; that actually they were her I believe boyfriend's, the sister's boyfriend's, children, and that he had brought them up from California; That one was his and that one was his wife's, his California wife's, by a prior marriage.

"Q. Did she have occasion to make further statements concerning the nature of her legal problem?

"A. *At that time I told her that I needed to have further information, that there were some problems that had to be looked at.* You had to have a judicial termination of the rights of the natural parents, first of all, and that the only way you could that would be to have them served or to have them do a voluntary waiver which had to be in writing, notarized, and so forth.

"Q. *Did you have occasion to give her further advice about the natural parent?*

"A. *I told her there would have to be a determination who the natural parents were that still had rights. I asked her if the natural father was still alive of the one child and would he consent to an adoption. I believe I asked her also about the natural mother.* She then responded that no, the natural father still was alive and I believe said that he was still looking for the children. And I think she said the authorities in California were also looking for the children.

"Q. Did she say anything about the natural mother?

"A. At that point in the conversation I don't believe she did. She referred to the natural mother several times in the total conversation we had.

"Q. Did she have occasion to make further comments at this time concerning these children?

"A. Yes. She told me, and again the sequence in which this occurred is a little bit vague in my mind. Tiny tended to hit points and go off to other points and then come back to them. Nevertheless I think at this point in the conversation, she stated that she was concerned about the two children because she did not think the sister and the boyfriend would take good care of them. The sister wasn't very—if I remember her words—consistent or concerned with their care. She also felt that the boyfriend had a tendency to be violent and might even physically harm the children; she was concerned about that. She also, at approximately this point in the conversation, indicated that the one of the two girls had medical problems.

"Q. Did she indicate what kind of medical problems?

"A. No, sir. She did indicate that it was something that would get worse with age and required an extensive amount of medication and that she was concerned about that. She didn't think the sister and the boyfriend would take adequate care of that medical problem.

"Q. Did you tell her anything about all this?

"A. yes. I told her that there were serious problems. I ran through the things you have to do to get a termination; And that you have to either serve them with the papers and then have a court proceeding or that you had to have a voluntary relinquishment of their rights waiver, and that wasn't always easy to get. I believe I then asked her again, because I was still vague in my own mind, was the natural father alive, was the natural mother alive. At this point in time she responded that no, the natural mother wasn't alive and very vaguely alluded to the fact she was dead in some manner.

"MR. GUHIN: Well, Your Honor, I am going to object to the use of the word very vaguely. I think it calls for speculation on the part of the jury. If he can relate what she said to him, the jury should be able to determine if she vaguely, you know, inferred something. But I think we are getting a conclusion from the witness when he uses the words very vaguely. I think he should use the word that was told to him the best of his memory.

"MR. BOWER: I'll rephrase the question.

BY MR. BOWER:

"Q. Do you recollect what she told you about the mother?

"A. Now, this varied throughout the conversation. Her initial indications at the beginning of the conversation were simply that the natural mother was the first wife of the boyfriend and was in California. Later in the conversation the natural mother was dead in some manner. I believe her words were, 'She's dead.' Towards the end of the conversation, she stated that the natural mother had in fact been killed. I don't remember whether she used the word killed or murdered. But in any event, had been killed, had not died a natural death. She also stated that the boyfriend had been involved in this killing.

"Q. She did?

"A. Yes, sir.

"Q. How did she state that?

"A. *I believe her words were at that point in the conversation,* that the natural boyfriend was about half crazy and that he had murdered or killed the California wife and *that she was concerned that he might also physically harm the children or might physically harm her, Tiny.*

"Q. Tiny was concerned about that?

"A. Yes. She indicated a great deal of concern several times in the conversation that the boyfriend would physically harm her. She indicated at approximately this point in the conversation that she wanted to proceed with the adoption while they were gone. Apparently the boyfriend and sister was gone. She didn't say where. And she wanted to proceed with this adoption while they were gone without letting them know so that when they came back it would be all done and through and they couldn't do anything about it. *I told her that there were two problems. Number one, that again in order to get an adoption, you had to terminate the parental rights and that required either a service on them of the appropriate papers* or she supply them with the appropriate papers, either one of which they would have to be aware of. And, *number two, that there was no way that you could do all of this in the time period she was talking about. Simply wasn't long enough. I also told her at this point that she had to be concerned about the natural father, that he was there in California and was looking for them.* Obviously he was not going to consent to a waiver and was not going to be deemed to have abandoned the children and all this meant that she probably could not get a termination.

"Q. How did they respond to that advice?

"A. *She reiterated again that she was very concerned about the children, that she wanted to see this done, and at this time point in time she wanted to proceed if she could at all do so. But I again told her I could see no way. I told there were two problems. Number one, in terms of the case itself. It was not a case I would take. I believe my exact words were 'I*

*wouldn't touch it with a ten foot pole for a million dollars.' Secondly, that she was going to have to be very careful of what she did because I didn't think there was any way she could get a termination under those circumstances, and I again described the problems. And I told her I also felt she should take a very close look at what she was doing in terms of possible criminal involvement, that she might be getting herself right into the middle of an accessory, aiding and abetting, or a conspiracy situation as to at least the one child, that that appeared to me to be a possible case of kidnapping; she should take a careful look at it.*

"Q. Did you make any arrangements with her at this point for further contact?

"A. I told her I was sorry, that there was nothing I could do, I'd be happy to answer any other questions she had, if she had any, but I didn't see anything that could be done. I told her that she should watch out, be careful what she was doing. I asked her if she would let me know what her decision was, that I was interested in what happened, what she decided to do."
Tr., Vol. 12, pp. 1617–26 (emphasis added.)

If the foregoing is not a perfect exemplification of an attorney interviewing a potential client looking toward the possibility of representation, then I have never seen one and never expect to see one. In order that the interested reader can see, in context, the portion of the interview set out in the majority opinion, it has been necessary to provide some of the conversation prior thereto, and some subsequent. For my part, I do not see the majority's quoted excerpt from Mr. Aldridge's testimony as a proper answer to anything Mrs. Iwakiri had said at that time. Of that it was highly prejudicial to her there can be no doubt, but *it was not her statement.* It was the statement of Mr. Aldridge, and a statement which, in my view, he had no legitimate right to make.

Prior to his being allowed to testify the district court, in voir dire in aid of an objection, allowed considerable evidence,

and considerable leeway in the evidence, touching upon the issue of the existence of the privilege and the possibility of a waiver of the privilege. Mr. Aldridge took the stance that there had existed no privilege between him and Mrs. Iwakiri, although he had been well informed that the right of privilege was being claimed by Mrs. Iwakiri and her defense counsel:

"Q. So to cut through everything, you didn't want to talk to Mr. Wyman until you got Mrs. Iwakiri's permission; is that correct?

"A. Or order of the court. I don't know if permission is correct or not. The words I have used were unless she waives any potential client privilege."

. . . .

"*I then told Mrs. Iwakiri that I was not going to reveal that information to anyone save and except under actual court order or if Tiny would waive whatever client privilege might exist.* I then asked her, 'Did Mr. Wyman, Jon, talk to you about that?' And she answered, 'Yes, he did. It's okay for you to tell Jon whatever he wants to know. You do whatever he says to do.' I then said, 'Now, I want to make it clear, you don't have to do this. I am not your attorney, this is not legal advice to you, nonetheless you don't have to do this; it's your choice.' She said, 'No, you go ahead, whatever Jon wants you to do, you do.' I then said, 'Thank you.' I don't recall if she said anything in the nature of goodbye, but we then terminated the conversation. I then went back in and told Mr. Wyman, 'Tiny said it was okay for me to talk to you, to do whatever you said to do.' "

Tr., Vol. 11, pp. 1555–57 (emphasis added).

"Q. All right. Mrs. Iwakiri never said it was fine for you to tell Becky Boyer, did she?

"A. In those words, no.

"Q. Mrs. Iwakiri never told you you had her permission to testify at the grand jury in California, did she?

"A. To the best of my memory Mrs. Iwakiri and I never discussed that particular question, no.

"Q. You never called her and even let her know you were going down there, did you?

"A. I saw no reason why I should, since she was not my client and I was acting under a subpoena.

"Q. If you saw no reason because she wasn't your client, why did you claim the attorney-client privilege when you got to California?

"A. Because I indicated to the court that I was not necessarily—in the hearings before Judge Morris and in hearing *before the grand jury, I indicated to them that I myself did not feel there was an attorney-client privilege.* Nevertheless before I would proceed further, I felt that question should be settled by the court because of the potential of such question arising. *I myself however did not feel there was such a privilege.*"

Tr., Vol. 11, pp. 1561–62 (emphasis added).

"A. I also contacted two attorneys that I knew whose judgment I felt might be appropriate on the question, and I contacted one judge that I knew who I also felt might have some—

. . . .

"A. I had briefly obtained the services of a fellow attorney to advise me on the question of the attorney-client privilege. I believe I discussed it with him."

Tr., Vol. 11, pp. 1567–68.

"Q. And in that conversation, did she present to you a situation in which she was seeking your legal advice?

"A. In a very broad sense, yes.

"Q. And, to use your words, in a very broad sense, did you give her any advice?

"A. If by 'advise' you mean did I give—

"Q. Yes or no, sir?

"A. Sir, I don't know if you mean by the word 'advice' you mean legal advice or what you mean by that word.

"Q. Did you answer a question?

"A. I answered a number of questions. I also propounded a number of things not in regard to questions.

"Q. And did you answer questions as a lawyer?

"A. Again, I think that you are asking—

"Q. Yes or no?

"A. I cannot answer that one yes or no.

"Q. You don't know?

"A. Well, I know, sir, what my answer will be. That is an ambiguous question in my own mind if I understand it correctly. I was a lawyer at that point in time; therefore any answer I give, I would give in a physical status as an attorney. I had declined to take her case, and I had told her I would not take her case. In my own mind I was not answering those questions as her attorney, if that's your question.

"Q. Sir, I didn't ask you if you were her attorney. It's quite obvious that you are not. What I asked you was, when she proposed this problem, a legal problem she had, did you answer her and tell her in your opinion what she should do? Yes or no?

"A. Some of questions she asked, I answered in a legal form; yes, sir.

"Q. Did you ever tell her what you thought she should do?

"A. Yes, but I think most of those were in a nonlegal sense."

Tr., Vol. 11, pp. 1586–88.

After the trial court ruled against the claim of client-attorney privilege, and after the prosecutor had examined Mr. Aldridge, on cross-examination Mr. Aldridge was asked concerning his statement about black-market babies. This revealed that Mrs. Iwakiri had said nothing whatever to him about black-market adoptions, or anything whatever in the nature of his volunteered remarks as to what he did not handle:

"Q. In that first phone conversation with Mrs. Iwakiri, she told you that she had an adoption situation she wanted to talk to you about; is that correct?

"A. Yes, sir.

"Q. And your very first answer to her was that you don't deal in black market adoptions; is that correct?

"A. My answer to that particular statement of hers, yes, sir. I explained to her about not dealing in that sort of thing, yes, sir.

"Q. Because you were concerned about some problem you had had in the past, getting involved in something you weren't really ready for, right, more or less?

"A. No, sir. I believe that's in reference to a later point in the conversation when I was telling her that I would not take the case until I had examined the facts. At that initial point that you are referring to, as far as thinking about adoption, I and other attorneys that I was aware of in the State of Idaho, had been approached by a person who at first appeared legitimate in terms of having some form of adoption service, and at least in my own mind I later determined was in fact trying to black market babies. I was very concerned about that and I thought perhaps that word had been spread that those were available and that that's what that phone call was about.

"Q. You yourself had been involved with a lady that you later, at least in your own mind, felt was trying to go through black market babies with you; isn't that correct?

"A. I had not been involved. I had had one phone call from that lady, an initial contact phone call. I had done nothing whatsoever with her other than have the one phone call."

Tr., Vol. 13, pp. 1719–20.

He made no claim whatever to having terminated the conversation leading to a potential representation, and conceded his volunteered statement as to what adoption he didn't want was premature:

"Q. Well, I'm using your term, 'black market babies.' Would you consider the conversation you had with Mrs. Iwakiri involving blackmarket babies?

"A. As it turned out, no, sir. *I simply brought that up right at the beginning so that if it was something she had in mind, we could stop the whole thing right there.* I probably interjected that a touch early. I should have asked her the question first."
Tr., Vol. 13, pp. 1720–21 (emphasis added).

Nevertheless, and notwithstanding his voir dire examination above set forth, and now testifying not to the judge but to the jury, he said in effect that the prolonged interview, which he could have cut off at any time by merely clicking down the receiver on his phone, was out of curiosity:

"Q. You were interested enough in this conversation to make sure she called you back, right?

"A. I was curious as to what she did, what her decision was, because she had indicated she didn't know what she was going to do. I also told her that I thought she should take a look at the criminal involvement, and I was curious as to whether she was going to do something there.

"Q. You have also told us that at least in your own mind she was never your client?

"A. In terms of my office procedure, no, I did not regard her as a client in that sense.

"Q. Didn't you think you were concealing a murder and a kidnapping then?

"A. No, sir. I didn't think I was concealing anything. *At that point in time my understanding of the attorney-client privilege as it existed was that I could not say anything to anybody about any conversation she had had with me; therefore, I was affirmatively barred from doing anything about that.*"
Tr., Vol. 13, pp. 1721–22 (emphasis added).

The importance of the misstatement in the State's brief cannot be over-emphasized. It very well could have led to a miscarriage of justice. The disturbing factor is that it purports to be based upon a reading of the record, but the record is contrary. Taken in its totality, there could hardly be a clearer case of an attorney interviewing a potential client, and only at the close of that interview telling her that "I was sorry, that there was nothing I could do, ... I didn't see anything that could be done ...." Tr., Vol. 12, p. 1626. The testimony is there in black and white that he was aware of the attorney-client privilege, and sought out independent advice thereon from three attorneys and a judge. Notwithstanding all of that, the flavor of his testimony displays a ready willingness to testify if a court would only order him to do so. A court in California would readily oblige him,[1] and the Ada County district court did likewise.

---

1. The grand jury proceedings which Mr. Aldridge, in his Idaho district court testimony, voluntarily referred to, *supra*, taken from Vol. 11, p. 1562, did not mention that the privilege belongs to the client or *potential* client, and not having, or having asked for, the consent of Mrs. Iwakiri, easily convinced an obliging superior court judge that what he was there to reveal was not confidential and he was *not* invoking the privilege.

"THE COURT: Mr. Aldridge, will you tell the Court any knowledge you may have with regard to the attorney-client privilege as exists in the State of Idaho?

"MR. ALDRIDGE: The relevant statutory scheme is a listing of a series of privileged communications.

"The relevant portion as far as attorney-client reads as follows:

" 'An attorney cannot without consent of his client be examined as to any communication made by the client to him or his advice given thereon in the course of professional employment.'

"There is a severe lack of any particular case.

"Idaho reports only at the top Supreme Court level, none at the district or magistrate's court level.

"The two relevant cases, number one, a 1908 case establishing that the burden of this privilege is on the attorney to establish whenever he invokes the privilege; number two, a case relating to the client portion of it saying:

" 'If the relationship ceases to exist at the time of the communication, there is no privilege.'

"Secondarily, as far as interpretation of rules relating to evidence on the one hand and to criminal law in general on the other, the State of Idaho has in general looked first to the State of California since much of our law comes almost verbatim from California.

"Number two, to the Federal Rules if they do happen to apply to the area.

"Number three, to other Pacific Digest jurisdictions.

"THE COURT: Were you in fact, sir, invoking the attorney-client privilege before the Grand Jury or seeking the Court's guidance?

But it was in error, in which all agree but Justice Shepard. While I agree with the majority opinion on this issue as far as that opinion goes, it does not go far enough. In short, it does not rule out all of Mr. Aldridge's testimony, which should be the main, and probably the only, holding in this appeal. Unlike the hypnotized witnesses issue, where the State asks us to apply the harmless error doctrine, the State does not say that it can still make out a case without the testimony of Mr. Aldridge. On that basis Justice Bakes, in writing for the Court, takes a very unusual position indeed in refusing to enter into his considerations that both determinable and important is the precise time at which Mr. Aldridge declined to represent Mrs. Iwakiri in the contemplated adoption. In what Justice Shepard often describes as a "lateral arabesque," Justice Bakes, with an acquiescing majority, neatly sidesteps the issue by observing only that "It was not until sometime after he completed that statement [the volunteered black market interjection] that he turned down potential employment by appellant." Nor is this omission corrected in footnote 1 of the majority opinion which blandly states that: "Any communication between Aldridge and Iwakiri subsequent to his refusal to handle her case falls outside the scope of the privilege and is admissible." Where the majority, although they readily acknowledge that there was prejudicial error necessitating reversal, are insisting that on remand there can be a second trial, I strongly disagree, on a number of grounds, that there can or should be another trial, one ground being that in the ten minutes which it takes to examine and evaluate the transcript of Mr. Aldridge's testimony, it is inescapable that *none* of it should have been admitted at the trial the proceedings of which we review, and none of it can be admitted at the retrial for which Justice Bakes, speaking for a majori-

ty, remands. Where the record is before us, and where the testimony of Mr. Aldridge has been thoroughly displayed to this Court both in the appellant's brief and in drafts of my opinion, it is a strange appellate practice that the Court avoids its responsibility to point to any testimony of Mr. Aldridge which will be admissible. The answer is, of course, that there is none. Without that testimony, but especially without that testimony and the tainted testimony of the hypnotized Mrs. Boyer, there is insufficient evidence against Mrs. Iwakiri to let the case go to a jury. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The verdict of the jury convicting Mrs. Iwakiri should be set aside and the judgment of conviction thereon should be reversed. Other than for the fact that in proceedings in district court the sentence imposed was reduced to 120 days of time already served, at the same time the district court reduced the judgment to a misdemeanor, thereby terminating the case, this Court would properly direct a dismissal. Here there is no need to. While the wheels of appellate justice ground inexorably slowly, though finely, District Judge Newhouse has meanwhile terminated the case by doing as much for Mrs. Iwakiri as the law allows his office to do. It is beyond cavil that the State's case hinged almost entirely on the testimony of Mr. Aldridge, an attorney giving the appearance of being compelled to testify against a person who had been interviewed at length by him when she sought to employ him for an adoption. Any attorney of even limited trial experience will recognize the devastating effect such testimony would have. The prosecutor minced no words in his summation to the jury:

"That brings us to Robert Aldridge. Robert Aldridge took the stand and you

"MR. ALDRIDGE: I was seeking the Court's guidance.

"In my own mind I'm not convinced that I in fact did enter into an attorney-client privilege. Nevertheless, not being sure of what the California law might be in that regard, I thought it best to obtain a ruling.

"The Court therefore gives the *advisory* ruling that you should reveal the conversation that you had during the summer days of 1977 with Mrs. Tiny Iwakiri.

"MRS. ALDRIDGE Thank you."
Exhibit No. U–3, California Grand Jury Proceedings, pp. 23–25.

had adequate opportunity to evaluate him.

"He spent a couple of days on the stand telling you about his involvement in this case. Before you evaluate his testimony, look carefully at that man, consider carefully where he comes from in this world, consider carefully his bias or prejudice in this case, consider what he has to gain or lose, consider if he has anything to gain or lose from spending parts of his short life in three and four day blocks testifying in courtrooms in California and in Boise.

"He told you about two telephone conversations that he had had with the defendant Juanita Iwakiri. She had called him and told him that, 'My name is Tiny, Juanita Iwakiri.' He had written that down.

"He recalls the McKinney Street address and he recalls her telling initially about her sister and her boyfriend had brought some children up from California, that the natural father was looking for the children and so were the California police.

"She then told him that the children had actually been kidnapped ultimately during the course of that phone conversation that he indicates was long that he told you about.

"And he finally told her that, 'I wouldn't touch this case with a ten foot pole.'

"He talked to her, indicated to her that it was important that she consider the criminality of what she was doing. He told her that if she knew what she said she knew, and he told you that she rambled and he questioned whether or not, since the story changed so much as she told it during the course of this conversation, he wasn't sure exactly what it was she was telling, but he recalls that the man had actually murdered his wife and taken the two kids and that the defendant, Juanita Iwakiri, wanted to proceed with this adoption while the sister was gone.

"He indicated to her, 'Well, we can't do it that way. It just doesn't work. I can't do that and nobody can do that for you. Are you sure you want to do this? Is the natural father, the father of these children, looking for them?'

"She said, 'Yes. Yes, he is, so are the California police.'

"He told her that she should think very seriously about this, very seriously about notifying the authorities.

"She called back and they had a second conversation some weeks later. She talked about a trip that she was involved in where the children had been retrieved.

"She told Bob Aldridge, 'I'm not going to call the police.' And as you recall, she said to him, 'I'm afraid the one child is sick. There is some difficulty with the medicine there.'

"He indicated to her at that time that she should take care of the matter and assist in this by doing something with the police anonymously. She said, 'No, I'm not going to do that.'

"In fact, he recalled words to the effect that she told him, 'I'm going to find a hole and crawl in it.' And that's what she did, that's what she did.

"Bob Aldridge told you from the stand that he has searched his conscience about what should have done about that, about the fact that if he hadn't taken his obligation as an attorney-client obligation seriously and done something at that point in time back in 1977, the summer of 1977, that those little girls might be with their father now.

"I thank you for your attention to my argument. I will have another opportunity this afternoon to discuss matters that Mr. Wyman brings up with you. Thank you."

It would be difficult to conjure the image of a jury which would not have convicted Mrs. Iwakiri after hearing that summation of what Mr. Aldridge's testimony proved against her. It established that she knew that the children had been kidnapped, and he, Mr. Aldridge, the attorney, had declared her criminally involved. As the

State urges, it does not need the testimony of Rebecca Boyer—not when it had the testimony of Mr. Aldridge.

II. **Recollection tainted by tampering with a witness's mind.** That this issue, one of first impression, has been captioned by Justice Bakes as "Admission of Hypnotically Refreshed Testimony" is a good indicator of the direction in which he would like to take the Court—and is succeeding in doing so. It is passing strange, however, that this particular case has been chosen as the vehicle on which to ride down the primrose path. As has often been remarked by this Court, important issues ought not to be decided without full adversarial briefing. Although the majority opinion correctly observes that assigned error is "the admission of the testimony of a witness whose memory was hypnotically refreshed." Aside from the fact that refreshment is somewhat misleading, and "probed" or "induced" would better suit the issue, the *only* briefing which we have received on this issue is that found in the brief submitted on behalf of Mrs. Iwakiri. The issue is thoroughly briefed with reference to the testimony of Rebecca Boyer, the witness who was twice hypnotized prior to her giving testimony, and fortified with reference to the testimony of experts who testified—all analyzed in the light of ample authority of judicial decisions and legislative enactments of other states. The discussion encompasses 37 pages, each and every page being germane to the assignment of error that the testimony of Mrs. Boyer should not have been admitted. The State's brief does not respond. That brief submits no statement of any authority on the hypnosis issue. Acknowledging that a trial object was made to Boyer's testimony, the State merely mentions that the trial court had stated that the issue was not the admissibility of the testimony but the weight of the testimony which is a proper jury function, and that the jury could determine the accuracy of her hypnotized memory. State's Brief, pp. 2–3. The only statement in the State's Brief resembling any argument on the issue is that "assuming without deciding that the hypnotism of

Boyer affected her ability to testify, the admission of her testimony was simply harmless error," State's Brief, p. 31, by which this Court is asked to declare that absent her testimony we are persuaded beyond a reasonable doubt that even with her testimony excised, the remaining evidence is such that on a retrial any fair-minded jury would convict Mrs. Iwakiri. That assertion is followed by the request that we affirm her conviction, which has been reduced to a misdemeanor. State's Brief, p. 31. The majority, with my concurrence, reverses for error in admitting the testimony of Mr. Aldridge, but, from my reading of that opinion, fails to pass upon the assignment of error which they acknowledge and then ignore. I do not understand why the majority opinion does not decide the issue raised, and why it instead proceeds to announce a new rule which is said to be necessary "Because we reverse this case for a new trial, . . . ." This is logically unsound. If Mrs. Boyer's memory has been tainted, and the appellants' brief—unanswered by the State—overwhelmingly is convincing that such is so, then, according to the new rule the majority announces, Mrs. Boyer's testimony cannot be ruled competent. It is absurd for the majority to say, as it unblushingly does, that "we must give the trial court some direction on the admissibility of hypnotically refreshed testimony." Just as with Mr. Aldridge, there is no excuse for this Court to not determine whether either Mr. Aldridge or Mrs. Boyer can testify. At the same time the Court should be keeping in mind that as to Mrs. Boyer, the State has conceded for all practical purposes that her testimony is not essential toward gaining a conviction. Clearly under the Court's new rule the trial court erred; equally clear is it that under that rule, for whatever value the testimony of Mrs. Boyer adds to the prosecutor's case, it has nevertheless been tainted by the two hypnosis sessions. Another absurdity, the opinion goes on to say near the end that "upon retrial of this case, the trial court should determine the admissibility of the hypnotized witness's testimony using

the guidelines set forth herein." It would seem that the Court which promulgates those guidelines, doing so in reviewing a record which, with excellent briefing, demonstrates that those guidelines were not followed, there is no way to rehabilitate a witness whose mind has thus been improperly tampered with. Perhaps, then, it becomes painfully in order that I acquaint the majority with the appellants' documentation and explanation of the manner in which the memory of Mrs. Boyer has already been established as tainted. As I read the new rule advanced today it recognizes the need to "protect against the dangers of confabulation," and, "If the witness's memory seems to have been altered in such a way as to render it unreliable, the trial court may rule the witness to be incompetent .... The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis .... The person conducting the session should be independent of the parties in the case." Majority Opinion, p. 11. Because the majority adamantly refuses to lay out for public view the previously cast-in-concrete factual setting to which its new rule applies, notwithstanding that it is readily available in appellant's brief, I must do so.

The present case involves the hypnosis of a key state witness to refresh her recollection. During the trial Detective Lance Anderson of the Boise Police Department was called as a State witness to testify about the hypnosis session that he conducted with Rebecca Boyer February 19, 1980. The defense objected to any testimony by Detective Anderson concerning his hypnosis of Rebecca Boyer on the grounds that Detective Anderson was not qualified to conduct the hypnosis session, but the court allowed his testimony, Rptr. Tr. V. 6, p. 862–66.

Present at the hypnosis session were Rebecca Boyer, her attorney, Robert Aldridge, who she had requested to be present, Detective Lance Anderson, the two investigators who had been primarily working on the case, Detective Worley and Specialist, McNichols, and another detective who had received the same formal training in hypnosis as Detective Anderson, Detective Stan Wood. In addition there was an operator and a recorder for the session. The session was tape recorded but not video taped. Rptr. Tr. p. 867. Not all of the session was tape recorded. Rptr. Tr. p. 868.

Detective Anderson was cross-examined concerning his qualifications to conduct the hypnosis session. Rptr. Tr. V. 6, p. 873 *et seq.*

Doctor Donald Rossi, the state's expert on hypnosis was called to the stand. Dr. Rossi was taken on voir dire by the defense and testified concerning the behavior under hypnosis known as "cueing".

"Cueing is behavoir which may give the individual information which is not a part of their memory system. All this is not of such great importance in its clinical uses, in its investigative uses it is extremely important." Rptr. Tr. V. 6 p. 926.

Dr. Rossi also testified that "confabulation is a natural process of the mind for filling in gaps between memory" and that confabulation can occur in a fully conscience as well as a hypnotized state. Rptr. Tr. V. 6 p. 926. Dr. Rossi also testified that hypnosis is not a test of truth. Rptr. Tr. V. 6 p. 927.

The key portion of Rebecca Boyer's testimony was her reportedly seeing the two missing children at the Iwakiri home. The reliability and veracity of these reported sightings was a critical point in the case. Dr. Rossi was asked whether he knew of any interviews with Rebecca Boyer conducted prior to the hypnosis session in which she reported seeing the children in the Iwakiri home. He replied that he thought that he had. Rptr. Tr. V. 7 p. 1014. Apparently there were no interviews, or at least no record of them with Rebecca Boyer prior to her hypnosis session in which she reported seeing the missing children in the Iwakiri home which prompted Dr. Rossi to testify that "all I can do is repeat what I have already said to

the court. If that information (an interview or interviews prior to the hypnosis session in which Rebecca Boyer reported seeing the missing children in the Iwakiri home) is not factual, then the procedure in that question is incorrect. If the information is factual then the procedure is correct." Rptr. Tr. V. 7 p. 1016. The procedure would have been incorrect because of "tainting."

Question to Dr. Rossi

"Q. You would agree with me with the hypnosis there is more tendency to have a tainting than in real life.

A. Yes, because of the heightened state of suggestibility.

Q. And you would agree with me that hypnosis may create a new memory rather than refresh an old one.

A. Depending on how the individual is interviewed that may happen." Rptr. Tr. V. 7 p. 1017.

The presence of Mr. Aldridge, Rebecca Boyer's attorney, during the hypnosis session also increased the risk of tainting or suggestibility.

Question to Dr. Rossi

"Q. Now, what happens if during the trance state her attorney begins adding information telling her dates, telling the circumstances. That is suggestive, isn't it?

A. Yes.

Q. And would you deem that to be improper?

A. From the practice that I use, yes. There should not be involvement by anyone else when the individual is in the trance state unless it's the composite artist.

Q. Did you see that in the interview during the trance that Mr. Aldridge had in fact added facts to Mrs. Boyer.

A. My recollection is that he said some things but prior to the induction.

Q. Would you like to—

A. I will take your word. If it comes past the induction, then I will accept that that's where it is.

Q. I am saying it is right during the trance itself.

A. Okay. That's what I am saying. If it during the trance, if it is post induction, then it was improper." Rptr. Tr. V. 7 p. 1026–27.

Another possible area or tainting or suggestibility is the responses given by the hypnotist to the subject.

Question to Dr. Rossi

"Q. But you would say that if it (responses by the hypnostist to the subject during the hypnosis session) affects the subject, that it can taint to some degree or another the information that we are getting out of the subject.

A. I would just change the word "taint." It reinforces the individual to what has been said. It may or may not taint. Taint would mean that you now have a production of something which is not real.

Q. What you are saying is, you may have something that is real and you may not, but you don't know.

A. That's correct.

Q. And suggestibility many times will push us into the confabulation area as compared to not.

A. It could. It could." Rptr. Tr. V. 7 p. 1035.

The defense objected to the proposed testimony of Rebecca Boyer on the grounds that the hypnosis session conducted by Detective Anderson did not meet the standards established by the state's own expert, Dr. Rossi. Rptr. Tr. V. 7 p. 1037–38.

The court ruled that Rebecca Boyer's testimony would be admissible observing:

"Now, I realize this is a case of first impression here in Idaho, and it's a rather novel question, and I have done a lot of soul searching in the last few days with all these various briefs and I have had my own law clerk working on standards.

But this Court is of the opinion that the modern jury as represented by these people, and I think the trend of the law is

going that way in all kinds of these keeping things away from the jury can as easily as this Court determine how accurate the testimony given by Miss Boyer is after she has had her mind refreshed by this hypnosis.

Now, all the attacks on the hypnotic methods used, which I listened here for the last two or three hours, seemed to go to the weight of the evidence to the jury rather than to its admissibility by this Court." Rptr. Tr. V. 7 p. 1044.

Dr. Rossi gave his opinion that the hypnosis session conducted by Detective Anderson with Rebecca Boyer, February 19, 1980, did conform to acceptable standards for conducting such an interview. Rptr.Tr. V. 7 p. 1047.

The defense renewed its objection against the admission of Rebecca Boyer's testimony on the grounds that: 1. the testimony had been rendered incompetent by virtue of the hypnotic trances that she had been through, 2. that her testimony had not been independently verified as is required by the State's own expert and, 3. the foundation for allowing her testimony showed that the standards for conducting the hypnosis session had not been met. Rptr.Tr. V. 7 p. 1143.

The defense again renewed its objection to Rebecca Boyer's proposed testimony emphasizing that the standards for admissibility had not been met. Rptr. Tr. V. 7 p. 1148.

The court overruled the objection observing that:

"THE COURT: Well, as I indicated prior thereto that I felt if there had been sufficient foundation shown to the Court, I am willing to allow this testimony and it may. be that after I hear the testimony preliminary on this witness, Miss Boyer, that I have a different opinion.

But I am still of the opinion that if sufficient foundation is given by the State through Miss Boyer, which I anticipate from counsel's statement, although I haven't heard this, that there may be, then

I will allow this evidence to be submitted to the jury.

Again, this Court is of the opinion that the modern jury just as easily as this Court can determine how accurate this testimony of Mrs. Boyer is after she has had her mind refreshed allegedly by hypnosis.

And all the attacks on the hypnotic methods used by these various witnesses and the corroborating testimony, at least that has been brought in by Lance Anderson and Officer McNichols and Doctor Rossi, this will go to the weight to the jury rather than the admissibility by this Court.

I think the more enlightened view is that refreshing memory by this hypnosis should be allowed to be utilized. I think it would be foolish of this Court to say this science is so inaccurate that you should keep it all out.

MR. WYMAN: Judge, you understand that corroboration is not corroboration beforehand. It is corroboration of her testimony or statements made under hypnosis that has to occur.

THE COURT: Well, I think I understand that very well from Doctor Rossi's testimony.

I don't think there is any question that I understood Doctor Rossi's testimony. And from that I just can't help but feel, Mr. Wyman, this should be given to the jury.

Now, it may be when I hear this witness and her testimony from her mouth how this happened, and various things, I might change my mind. But I want to give you my—

MR. WYMAN: Well, I think the Court misunderstands one thing on my point here. There has to be evidence other than Miss Boyer to corroborate independently the things she says. For example—

THE COURT: Well, I don't know what she is going to say. That's way I'm hedging a little, Mr. Wyman. I don't have any idea what her testimony is going to be other than the fact apparently she saw some children. That's the best I got out of it.

MR. WYMAN: Well, Exhibit 23 illustrates what I'm saying. What I'm saying is, they have got to have some proof. If she said, 'I saw children on such and such a day, on March 1st of 1981,' and that came up through hypnosis, she's going to have to have some witnesses, 'Yeah, I was there, too.'

THE COURT: No. I don't think so. Overruled.

MR. WYMAN: That's what the cases say.

THE COURT: Well, I follow your logic, Mr. Wyman, and I realize this is a novel impression here in Idaho and that's what I want to make clear, how I felt about the matter.

MR. WYMAN: And you understand that Doctor Rossi said that, too.

THE COURT: Well, I realize there has been a million people saying everything. So I guess the final decision is mine." Rptr.Tr. V. 7 pp. 1148-51.

Rebecca Boyer was called to the stand and testified that Iwakiri contacted her after Iwakiri was first interviewed by the police and that Iwakiri told Boyer that she was going to tell the truth which was that Iwakiri's sister had had the missing children and that a man, presumably Roy Summers, had killed five or six wives. Rptr.Tr. V. 7 pp. 1157-58. Boyer continued that she was interviewed by police February 6, 1980, and that she identified two photographs as being children that she had seen in Iwakiri's house. Rptr.Tr. V. 7 p. 1159. Boyer commenced the practice of calling either Officer Whorley or Officer McNichols whenever she thought of something that might be helpful in the case. Rptr.Tr. V. 7 p. 1160. On February 16, 1980, Officer Whorley came to Boyer's house in response to a telephone call from her to hear about her reported remembering that Iwakiri wanted to adopt the two missing girls who were the subject of the case and who had reportedly been seen in the Iwakiri home by Boyer. Rptr.Tr. V. 7 p. 1161. Iwakiri reportedly told Boyer that her sister lived with a man in California who beat his wife and took two children and that the children were brought to Iwakiri's home. Rptr.Tr. V. 7 p. 1163. Boyer reportedly referred Iwakiri to Robert Aldridge, an attorney, for possible adoption of the children but Iwakiri decided not to use Aldridge. Rptr. Tr. V. 7 p. 1171-2. Boyer reportedly saw the two missing girls in the Iwakiri home and also in her home. Rptr.Tr. V. 7 p. 1174. Iwakiri reportedly said that the older girl had some kind of disease which got progressively worse (which would be consistent with cystic fibrosis). Rptr.Tr. V. 7 p. 1176. Iwakiri reportedly brought the two girls back from California in a pickup camper. Rptr.Tr. V. 7 p. 1179. Boyer reportedly saw Roy Summers in the Iwakiri home and was reportedly told by Iwakiri that Summers was Iwakiri's brother. Rptr.Tr. V. 7 p. 1184-5. After her arrest, Iwakiri reportedly told Boyer that she had kept the missing children in her home but that it had just been on a drop in basis. Rptr.Tr. V. 7 p. 1190.

Under cross examination Boyer reported seeing two dark haired ladies with Roy Summer in the Iwakiri home. Rptr.Tr. V. 8 p. 1224. One of the dark haired women was heavy set and attractive and was reportedly introduced to Boyer as the wife of the man who Boyer identified as Roy Summers and who was reportedly introduced to her by Iwakiri as Iwakiri's brother. Rptr.Tr. V. 8 p. 1262. However, this heavy set dark haired woman was in fact Molly Casner, Iwakiri's sister, who Boyer had reportedly been introduced to by Iwakiri as Iwakiri's mother, Bertha Estess. Rptr.Tr. V. 8 p. 1287-90. Boyer said she knew the person who she identified as Roy Summers as "Tiny's" brother, rather than that he had been introduced to her as Iwakiri's brother. Rptr.Tr. V. 8 p. 1238. However, Boyer repeated that Roy Summers had been introduced to her as Iwakiri's brother. Rptr.Tr. V. 8 p. 1269. Boyer reported seeing the missing children a total of five or six times. Rptr.Tr. V. 8 p. 1302.

Boyer reported that her hypnosis sessions involved "trying to see through the clouds." Rptr.Tr. V. 8 p. 1209. Boyer said that she does not always say what she

means and that this sometimes causes her to be misunderstood. Rptr.Tr. V. 8 p. 1251. An example of this possible misunderstanding is Boyer's identification of Roy Summers as being Iwakiri's brother. Rptr.Tr. V. 8 p. 1258. And the previously mentioned confusion by Boyer between Bertha Estess, Iwkiri's mother and Molly Casner, Iwakiri's sister is another example.

Boyer had herself hypnotized a second time at the Boise Hypnosis Center by a Dr. Streib in January of 1980 before the first trial, and Boyer informed the prosecutor of that session. Rptr.Tr. V. 9, p. 1446.

The defense's first expert on hypnosis, Richard Hannebaum, was called to the stand. He testified that, in his opinion, the pre-hypnosis sessions with Rebecca Boyer should have been taped if not video taped. Rptr.Tr. V. 17 p. 2415. Concerning the persons in the room during the hypnosis sessions other than the hypnotist and the subject, he testified that:

> "A person in hypnosis is in a state of accelerated susceptability or suggestability, and if there is a conversation going on, they could pick up bits and pieces and believe this conversation may be applying to them and very possibly react to it or, even more dramatic, develop a post-hypnotic reaction to something that was said that wasn't even meant for them." Rptr.Tr. V. 17 p. 2421.

Mr. Hannebaum continued that if Rebecca Boyer was hypnotized at all, the trance was too light to be effective. Rptr.Tr. V. 17 p. 2444-45. He continued that hypnosis is an information gathering technique, not a truth getting technique. Rptr.Tr. V. 17 p. 2427. He testified that normally a subject under hypnosis wants to please the hypnotists and will confabulate to do so. Rptr.Tr. V. 17 p. 2428. Mr. Hannebaum continued his testimony by noting that Rebecca Boyer's post-hypnotic state was unlike anything he had ever seen. Rptr.Tr. V. 17 p. 2431. Also, he testified that Rebecca Boyer's reported flashes were not due to post-hypnotic suggestion. Rptr.Tr. V. 17 p. 2432 and 2448-49. Mr. Hannebaum concluded by testifying that hypnosis

can make it easier for a person under hypnosis to lie. Rptr.Tr. V. 17 p. 2444.

The defense's second expert on hypnosis, Dr. Bishop Basil Rhodes, was called to the stand. He testified that the heightened suggestability, to use Dr. Rossi's phrase, or the height of susceptibility, to use Dr. Rhodes phrase, associated with hypnosis sessions makes the danger of manufactured evidence a very real one, especially just prior to and immediately following the hypnosis session. Rptr.Tr. V. 21 p. 2933.

Dr. Rhodes testified that the presence of Rebecca Boyer's attorney and the numerous other persons at the hypnosis session, rather than only the person conducting the session and the subject being present, violated accepted standards for a forensic hypnosis session. Rptr.Tr. V. 21 p. 2937–39. Dr. Rhodes continued that

> "A. In regard to several people being present, we find that probably the hypnotist was conducting a group hypnosis, even though he was not aware of this as such.
>
> Q. What's the effect in doing that?
>
> A. The effect in doing this was the fact that everyone in the room was placed in a state of readily accepting all that was said as a fact, a state of acute, if you will, or I'll use the terms 'acute suggestibility.'" Rptr.Tr. V. 21 p. 2940.

Dr. Rhodes testified that

> "I found that it was my professional opinion, my findings were that the reliability standards for hypnotic investigation were decidedly in error." Rptr.Tr. V. 21 p. 2941.

Dr. Rhodes testified that, in his opinion, Detective Anderson coerced Rebecca Boyer by suggesting that the more intelligent a person is the more capable they are of achieving the desired results. Rptr.Tr. V. 21 p. 2941. Dr. Rhodes also testified that if there was "cueing" or information being supplied to Rebecca Boyer, whether intentionally or not, it would be impossible to tell because of the poor quality of the tape of the hypnosis session. Rptr.Tr. V. 21 p. 2943. Dr. Rhodes repeated his testimony that the presence of other people in the

room influenced the results. Rptr.Tr. V. 21 p. 2944.

Dr. Rhodes explained the basis of his opinion that the hypnosis session with Rebecca Boyer was not reliable in the following exchange:

"It was my opinion that she was in a very light state of hypnosis, if in any state of hypnosis. It's very difficult to fully evaluate, but I would say she was in a very light state of hypnosis.

I base my opinion on the following: The voice intonation. The spoken tense would indicate there was a lack of any depth. The clearing, constant clearing of the throat, this could be part of the subject's personality trait. However, it it not usually hypnosis. I did note it prior to and immediately following the session on the tape.

However, this type of physiological reaction we usually find in people showing extreme anxiety, insecurity. We even find it very much so in the process where there is a lie taking place or in the presence of a falsehood.

There was no indication that she was motivated to tell the truth; that is, by using pride versus a lie and using the ideomotor responses that I had referred to earlier.

In other words, she could be confabulating beautifully and moving ahead and this becomes absolute fact and there was no question about it being fact.

Q. I noticed you' made some remark about tense. We are talking about past, present, or future tense in verbal response, are we not?

A. We are.

Q. What does that indicate to you?

A. Oh, I'll make a specific reference here, if I may. Usually the tense is changed in the time frame in speaking to a particular person in hypnosis.

Mrs. Boyer changed time frames and tenses, past and present readily, which is not done in hypnosis.

Q. How did that come about?

A. Well, for instance, she moved from time and place. She used "I think we saw. I suppose," and "I don't remember" which would be entirely out of character.

And she goes on "They were, she is." She was not specific on dates. She confused cars and pickup trucks which generally would be extremely unusual.

Q. When people are under hypnosis, do they have a specific event or specific thought, specific detail?

A. Yes. They can recall detail very vividly. You can actually picture in your mind. You can place the person in hypnosis at the specific spot, time, place, and so forth, and they are there. They are seeing it or acting it out or taking an active part in it. In other words, it's actually being relieved.

Q. In this situation you are finding generalities and place and time being shifted; is that what you are saying?

A. Yes. Time and place were being shifted as she felt she wanted to. An individual in hypnosis, without any specific safeguards, lie beautifully, and convincingly and quite glibly, and it's done willfully.

Q. When you mean "willfully," you are talking about their own volition?

A. Their own volition.

Q. And one of the techniques of hypnosis is to move from their conscious volition to another state in which you are working solely with their memory?

A. Solely with their memory, that which is indelibly imprinted on the subconscious mind, if you will.

I used to use the term "everything that you have seen, heard, or done was put on microfilm."

I now when discussing with my clients, I have to use the term "it's the same as feeding material into a computer, bringing it up to date. Everything that has taken place in your life, everything that you have seen, done, heard, touched, felt, all of your emotions, virtually everything is recorded

subconsciously," and this true hypnosis can be recalled, specific time, place.

Q. Now, if the person is in this lessened state of hypnosis as you have here and you see the shifts, both geographically and time-wise and the use of willful volition, does this affect the credibility of the results?

A. It does indeed, because false memories then are accompanied by a subjective conviction that what they have said actually is reality, and we are convinced by the outward signs that it must be true.

What takes place, if you will, are false memories are accompanied by a subjective conviction. They believe it, and then we believe it, because they say it is so and they act this out at a conscious level, of course.

Even unconsciously, if the hypnotic session is not controlled, in hypnosis a delayed recall, for instance, that she has had is completely unheard of.

Q. When you are talking about delayed recall, you are talking about the episodes of August 12th, for example?

A. That would be an example, certainly, It's very easy for her in this particular state, and as I say, it's a very light state and there were no safeguards present at all. It would be very easy, and I felt quite sure, there were present for her to have fantasy and confabulation. I think this was quite obvious.

Q. Does part of the problem that we are seeing stem from improper techniques—and there are two terminologies, age versus time regression?

A. In order to accomplish full recall, it is necessary to use age regression or time regression. I use it almost daily with the subjects I deal with. It's interesting to note—perhaps I can bring it here to your attention so you can see it more clearly.

She's told that she is going to remember a great deal, and she does, but again there were no safeguards in the session itself, so no matter how much she remembers or what she remembers, to her it is accepted fact and it rolls on and on as if you were reading a good book.

For recall, a medium depth, at least, is required, and always the subject speaks in the past tense.

Q. That didn't occur here?

A. It did not occur here. For age regression, which is what is required in these cases, a loss of identification and awareness are necessary, because you are dealing only with memory. You were completely removed consciously from, we'll say, this courtroom, or in this instance where we are in the consultation room, we are not in the consultation room. You actually regress them back to the time and the place.

Q. They are reliving it, in a sense?

A. They are reliving it.

Q. All right. Now, did you find here that they went back to a particular time? In other words, was there appropriate technique to get her to a particular time in order to focus in and start working either forward or backward from that point to follow a pattern?

A. No.

Q. Must you do that? Or should you do that?

A. You should indeed.

Q. What happens if you don't do that?

A. If you don't, you are getting a false verification, if you will, of what actually took place. You are obtaining without placing them in a state of recall or in a state of age regression or time regression, you are receiving from them only that which they wish to produce for you." Rptr.Tr. V. 21 pp. 2949–2955.

In response to the question to whether or not he found anything to indicate that Rebecca Boyer was suffering from some sort of emotional problem, Dr. Rhodes responded that

"Yes I did. It would be my professional opinion that she was an extremely emotionally unstable person, quite confused.

Had she come to me as a specialist in hypnosis, I would feel obligated in every

respect to refer her to a mental health practitioner.

One of the striking notes—at least it rang quite a bell in my head as far as I was concerned in reviewing the material, was the fact that obviously no individual would leave her child with a person who has already stated that—at least on one occasion she used this person to baby-sit. All right. So she put the child there and that person had kidnapped children there and had already discussed the possibility of, quote, 'murder or killing,' or something to this effect, if you will.

I don't feel that any person in their right mind, or any mother, would place a child with someone there, which would be indicative of a form of instability in itself." Rptr.Tr. V. 21 p. 2978.

Dr. Rhodes explained his opinion that others in the room, particularly Mr. Aldridge, were also hypnotized during the session in the following exchange

"A. Yes. There is a phenomenon which is referred to as identical phraseology or mirrored phrases, in which people within the room where hypnosis is taking place will state quite often, or will make identical statements.

Q. Is it possible, for, let us say we are sitting here at the table with Mrs. Iwakiri and myself and Mr. Guhin, Mr. Bower, and that hypnosis session is going on in close proximity to us, for one or more of us to fall within the trance of the technician?

A. Certainly.

Q. And if this is done—well, strike that—does it happen with any frequency?

A. It happens continually. Any professional seminar where we demonstrate hypnosis, for instance, or where we are teaching hypnosis to a group of physicians or attorneys, even if I were to demonstrate hypnosis here, 90 per cent of the people within the room, and better than 90 percent of the time would be under hypnosis, not only the individual I'm working with specifically, but everyone present.

Q. To varying degrees?

A. To varying degrees. Some would be in a complete state of hypnosis. Some would be in a very light state of hypnosis, and some would be merely in a state of suggestibility.

Q. I believe you have indicated that in these lighter state of hypnosis that the individual suffers from suggestibility to a higher degree?

A. Yes.

Q. All right. Now, if a person has been hypnotized along with the subject to some degree, have you indicated to us that you will see a mirrored effect?

A. Yes.

Q. What do you mean by that?

A. I'm going to give you an example, if I may, and I picked only, I believe, four or five illustrations. There were numerous illustrations—this is in reference to Mrs. Boyer and her attorney, Mr. Aldridge,— and I based my opinion for the mirrored phrases on what she had said at the hypnotic session plus what he had said in transcript following the hypnotic session, and they are almost identical phrases. Some are actual mirrored phrases, indicating that he had been in hypnosis at the time the hypnotic session was conducted.

I'll give you the illustration, and then perhaps you will have a question or two I can answer on it at that point.

Mrs. Boyer stated, for instance, in the session, 'had been killed, had been murdered.'

Mr. Aldridge says in his testimony following 'had been killed, had been murdered.'

Mrs. Boyer stated 'boyfriend or husband.' Mr. Aldridge says 'boyfriend or husband.'

Mrs. Boyer stated 'But it was either her sister or a neighbor lady.' Mr. Aldridge stated 'I thought it was her sister, perhaps a neighbor.'

Mrs. Boyer stated 'in jail, my understanding.' Mr. Aldridge says 'Very vague about the charge, not sure. He's in jail.'

Mrs. Boyer said "I tried to recall the name but I cannot. The police have mentioned to me a Christian institution, such as a day school.' Mr. Aldridge says 'I don't recall a specific institution. It was an institution-type Christian home.'

Q. Does he also use the term 'Garden City' in his testimony?

A. Yes. Those are a few. There are one or two others that are there, but I think that will give you a picture of what I'm attempting to say as far as almost identical phrases or mirrored images of what the subject said in hypnosis.

Now, this—normally, no two people will give identical answers. You might once. It is possible and probable you might twice, but certainly no more than that. At most it would be twice you might give an identical answer, primarily because you are familiar with the tone or something, or it struck a particular chord with you in your own thinking.

However, in Mr. Aldridge's case, he was present at the session and he does show a very close correlation with the fact that it was almost identical phrases or mirrored phrases, indicating that he was in hypnosis.

Q. Now, isn't it kind of the acid test of that if they use words of vagueness? In other words, 'I'm not sure' or 'I'm vague,' and use that same phraseology?

A. That would be very indicative. If he were just as vague as the subject as he was on—I didn't make a specific notation on it, really, except to that particular point. Where he was just as vague as the subject, it would very definitely indicate that that was a material that he had picked up in the hypnotic session and that which he believed to be true.

Q. When the person has been under that trance, like Mr. Aldridge, and has received the material, will he know, 'Oh, hey, this came from hypnosis,' or will this just become a part of his memory in which he is now unable to distinguish reality from that which he had heard?

A. No, he will not be aware of it and he would not distinguish it between the reality he knows and the reality that he heard, or the supposed reality that he heard.

In either event, he would not really be aware that this was his feeling and this was why he was stating it. He would not associate this with a hypnotic session at all." Rptr.Tr. V. 21 pp. 2979–84.

Not only was the first hypnotist, Detective Lance Anderson, a member of law enforcement, but the second hypnotist, Dr. Streib saw Ms. Boyer *after* her memory had already been tampered with. Even under the Court's new totality rule, it would be impossible to conclude that Ms. Boyer could be a competent witness on a retrial. The puzzlement, of course, is why the full Court membership avoids saying so, full well knowing that for a number of reasons there will not be a retrial.

III. **The impropriety of the Court's new rule governing admissibility.** Even larger than the aforementioned puzzlement, if the majority feels that it must make a rule to provide for the use of hypnotized witnesses, is:

(1) Why it does so in this particular case, which should not and will not be retried?

(2) Why it does so in the face of overwhelming documentation, and respectable decisions of neighboring states, that the testimony of hypnotized witnesses is not reliable?

(3) Why it does so in the face of the solicitor general's considered view that the state of the science of hypnosis is not that far advanced that the Court can competently make a rule to govern the admissibility of the testimony of witnesses whose minds have been thus tampered with?

Discussing the three propounded questions in order, the first is in part somewhat answered by observing the third. The solicitor general, the Honorable Lynn Thomas, who is seen by many as making an eminent career in handling the criminal appeals for the Office of the Attorney General, neither wrote the brief nor argued orally in this case. This case was argued to the Court in Boise on Monday, January 16, 1984, with Justice McFadden (retired) sitting for Jus-

tice Huntley. On the previous Friday, the full Court heard argument in the case of *State v. Bainbridge*, No. 14544, still pending in this Court. *Bainbridge* is a companion case to *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), a capital case wherein the death penalty was imposed and that penalty upheld in this Court. Mr. Thomas both authored the State's brief in *Bainbridge*, and presented the oral argument. As sheer surmise, it would seem that the proponent of the Court's new rule may labor under the belief that the views of the solicitor general which were made known in his *Bainbridge* brief and oral argument need not be considered in promulgating a rule under the auspices of the Court's decision in this case, *Iwakiri*. Respectfully, I beg to differ. The first of these two cases presented to us was *Bainbridge*, and *Bainbridge* also very much revolves around the same question which we have here, i.e., the testimony of witnesses whose memories have been hypnotically tampered with. For my part, where this Court was on a Friday given the benefit of the views of the solicitor general on this important issue, it is then on the ensuing Monday, so to speak, both a discourtesy and unsound judicial practice to completely ignore those views—which undoubtedly are not those of a single person but of the entire office and complement of attorneys in that Department of the Executive Branch of Government. Those views, however, do not accord with the direction in which Justice Bakes now takes a majority of the Court, and it may be for that reason are ignored. But, even if the majority disagrees that those views are entitled to the utmost deference, those views should be considered—especially when those views have been soundly acclaimed and adopted in nearly every high court considering the issue. In his *Bainbridge* brief, Mr. Thomas succinctly informed us where the other courts have gone in this area of the law:

> "That State recognizes that a substantial body of case law has developed under which the admission of testimony of witnesses whose recollections have been refreshed or prompted through the medium

of hypnotism has been significantly limited. Three lines of authority have been developed concerning the admissibility of hypnotically enhanced testimony. The strictest approach is best expressed in *People v. Shirley*, [31 Cal.3d 18, 181 Cal. Rptr. 243] 641 P.2d 775 (1982), where the California Supreme Court held that until it can be established that hypnosis has gained general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved, the testimony of witnesses who have undergone hypnosis to facilitate recall is per se inadmissible. *See also, State v. Mack*, 292 N.W.2d 764 (Minn.1980). However, a number of courts adhering to the basic concept upon which such a rule is premised have modified its impact by allowing a witness who has been hypnotized to testify with regard to those matters which he or she was able to recall and relate prior to the hypnosis. *See e.g., State ex rel. Collins v. Super.Ct.*, [132 Ariz. 180] 644 P.2d 1266 (1982); accord, *Commonwealth v. Taylor*, [294 Pa. Super. 171] 439 A.2d 805 (1982).

> "The second line of authority, and one representing the 'middle ground' with regard to this issue, is exemplified by the holding in *State v. Hurd*, [86 N.J. 525] 432 A.2d 86 (1981), where the court concluded that the testimony of a previously hypnotized witness may be admissible if the state can demonstrate that the risks inherent in admitting hypnotically induced testimony have been avoided through the use of certain 'safeguards' or procedures during the hypnotic process.

> "And finally, a third approach, ultimately relied upon by the trial court in the case at bar, has been put forward by the Wyoming Supreme Court in *Chapman v. State*, 638 P.2d 1280 (Wyo.1982). In *Chapman*, the court held that the fact that a witness has been hypnotized does not render the witness incompetent to testify but instead looks to the credibility of the witness and the weight of the testimony—issues to be determined by

the fact finder. Further, the court did not require as foundation for such testimony a showing of the procedural safeguards set forth in *Hurd.* The court found that while compliance with such safeguards may enhance the credibility of the witness, there were too many variables in hypnotism to mandate such requirements."

*State v. Bainbridge,* No. 14544, Respondent's Brief, pp. 23–24.

Having nicely laid this helpful analysis before us, he candidly points out that under both the first and second lines of authority, the appellant there would have us hold that the testimony of previously hypnotized witnesses at Bainbridge's trial was improperly admitted. Rather than beseeching us to adopt the ignoble Wyoming rule—for which he is to be commended:

"The State submits, however, that the court should not reach the issue of what standard is to be applied in Idaho courts in determining whether hypnotically enhanced testimony should be admitted. Even those courts finding that such testimony may not be admitted have held that error in its admission is not reversible per se, but rather its effect must still be judged under the prejudicial error test. *See, People v. Shirley, supra.* The State contends that the admission of the testimony of the two witnesses who had been hypnotized in the instant case constituted harmless error, and even if improperly admitted was not error of such magnitude as to require reversal of the conviction.

"The standard to be applied when determining whether the improper admission of evidence constitutes reversible error is whether the appellate court is convinced beyond a reasonable doubt that the same result would have been reached had the evidence been properly excluded. *State v. LePage,* 102 Idaho 387, 630 P.2d 674 (1981); *State v. LaMere,* 103 Idaho 839, 655 P.2d 46 (1982). Assuming without conceding that the testimony of Gloria Leyden and Gary Chilton was improperly admitted, the jury would have reached the same result had the evidence been excluded.

"The State recognizes that although neither witness could identify both co-defendants, the cumulative effect of the testimony of Chilton and Leyden placed the appellant and the co-defendant in the station with the victim at the time the murder occurred, and identified the appellant as the individual rummaging through the cash register—thereby negating the appellant's defense that he was a non-participant in the crimes. However, the State submits that such testimony was not essential to its case."

*Id.* 24–26.

The brief was filed in this Court on May 12, 1983. At oral argument on January 13, 1984, Mr. Thomas was still of the same view. Repeatedly asked from the Bench what considerations should go into any rule which the Court might make, Mr. Thomas steadfastly advised us that a rule was not required and why a rule should not be made:

MR. THOMAS: ... We don't dispute the fact that hypnosis of witnesses is a potentially serious problem.... We urge the Court not to reach the hypnosis issue ... that it really, given the lack of full information on hypnosis, is a good time *not* to try to fashion a rule about hypnosis....

. . . .

JUSTICE BISTLINE: ... Has the office of the attorney general, prior to this case, ever made a recommendation or authorization or suggestion to prosecutors throughout the state or law enforcement that hypnosis be used or not used?

MR. THOMAS: ... I've never heard of our office suggesting the use of hypnosis to anybody....

. . . .

MR. THOMAS: ... You don't have to reach the hypnosis issue and shouldn't because of the legal complications in formulating a hypnosis rule....

. . . .

JUSTICE HUNTLEY: ... the argument that is made that it's not a credibility mat-

ter that the argument is that when people are under hypnosis they are very susceptible to suggestion when they come out of the hypnosis if they receive the hypnotic suggestion they believe. And as they sit on the stand and then testify about it they're going to be very credible because that's now part of their memory. Now, how is a jury supposed to sort that out in terms of credibility?

MR. THOMAS: ... I don't believe that's the character of the record....

....

MR. THOMAS: I don't know what the parameters of that possibility are. And I don't think that there is any empirical evidence that is good enough for this Court to fashion a rule about that at this point. That's my understanding of the state of that field of science.

....

MR. THOMAS: ... I'm suggesting to you that the empirical evidence about the effect of hypnosis on witnesses is sufficiently incomplete that neither the state nor the Court should take a position on that aspect of it at this juncture.

....

MR. THOMAS: ... All I'm saying is that we're not far enough along in our knowledge of this area to be able to formulate a rule unless it's absolutely necessary.

*State v. Bainbridge,* No. 14942, Oral Argument.

Basically, as I see it, Mr. Thomas has frankly and wisely requested that our *Bainbridge* decision not be used as the springboard for another rule, especially in this doubtful area. By that I understand the legal department of the State as recognizing that, while hypnosis may be used as a proper tool in investigation, even as Detective Anderson also testified, the incalculable and unknown effects on a witness's memory will render the witness incompetent except as to some wholly unrelated field of memory. I fully agree with Mr. Thomas, and find his views persuasive on the issue. Nothing which is found in the majority opinion is more convincing, and

nothing therein stands up against the weight of authority.

"Just when a scientific principle of discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidencial force of the principle must be recognized, and while courts would go a long way in admitting expert testimony adduced from a well recognized scientific principle of discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. U.S.,* 293 F. 1013, 1014 (D.C.Cir.1923).

Jurisdictions have adopted the *Frye* standard on the rationale:

"That expert testimony may be permitted to reach a trier of fact only when the reliability of the underlined scientific principles have been accepted by the scientific community. (citations omitted). In other words, scientists in the field must make the initial determination of whether an experimental principle is reliable and accurate." *State v. Canaday,* 90 Wash.2d 808, 585 P.2d 1185, 1188 (1978).

The California Supreme Court has held that the testimony of a witness who has been hypnotized to refresh his or her recollection about a particular event is not admissible concerning those events because of lack of reliability as measured by the lack of general acceptance in the scientific community noting that:

"Particularly relevant here are the cases that have excluded this evidence on the ground of the well known *Frye* rule."

*People v. Shirley,* 31 Cal.3d 18, 181 Cal. Rptr. 243, 641 P.2d 775, 783–84 (1982). A witness can testify "on a topic *wholly unrelated* to the events that were the subject of the hypnotic session." *People v. Shirley, id.,* 181 Cal.Rptr. at 273, 641 P.2d at 805 (emphasis in original).

The Arizona Supreme Court has held that testimony of a witness who had been

questioned under hypnosis regarding the subject of contemplated testimony is not admissible. *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981).

"It is generally agreed that hypnosis is a state of altered consciousness and heightened suggestibility in which the subject is prone to experience distortions of reality, false memories, fantasies and confabulation (the 'filling in of memory gaps with false memories or inaccurate bits of information'). (citations omitted). For example, Spector & Foster, supra, state, at page 578:

'The hypnotized subject may respond to implicit stimuli unintentionally emanating from the hypnotist, and unrecognized by him. The desire to please the hypnotist may induce the subject to mirror the attitude detected in the hypnotist's questions and in his behavior.

For example, a subject might confess to a crime if the hypnotist's questions unintentionally implied guilt.'

In addition, a person may assimilate the distortions, delusions and confabulations he develops under hypnosis as part of his own memory. After the hypnotic session has ended, the subject would then perceive those hypnotically induced impressions to be reflections of his actual past observations. 9 Encyclopedia Britannica, supra. [T]he subject may actually believe he is remembering * * * on his own, when in reality the 'memory' was implanted by the hypnotist. Dilloff, supra, at 4.

A recent law review article by an author who is both a professor of law at the University of California at Berkeley and a clinical professor of psychiatry at the University of California at San Francisco contains the following opinion:

'I believe that once a potential witness has been hypnotized for the purpose of enhancing memory his recollections have been so contaminated that he is rendered effectively incompetent to testify. Hypnotized persons, being extremely suggestible, graft onto their memories fantasies or suggestions deliberately or unwittingly communicated by the hypnotist. After hypnosis the subject cannot differentiate between a true recollection and a fantasy or a suggested detail. Neither can any expert or the trier of fact. This risk is so great, in my view, that the use of hypnosis by police on a potential witness is tantamount to the destruction or fabrication of evidence.' Diamond, supra, at 314.

Few reported cases have addressed the issue of the admissibility of testimony offered by witnesses who have undergone hypnosis in an attempt to increase their memories concerning events about which they may testify. As the Court of Appeals correctly noted, most courts which have considered the question have concluded that prior hypnosis neither renders a witness incompetent nor renders a witness' testimony inadmissible. (Citations omitted).

The first of this series of cases which hold testimony of a previously hypnotized witness to be admissible, *Harding*, 5 Maryland Appeals 230, 246 A.2d 302 (1968) cert. denied 395 U.S. 949 [89 S.Ct. 2030, 23 L.Ed.2d 468], handled the admissibility question cursorily, relying solely on the witness' declaration that she was testifying from her own recollection: (quotation omitted).

The court then considered the sufficiency of the hypnotized witness' testimony to support the verdict.

None of the early cases following Harding which approved the admission of testimony from previously hypnotized witnesses contain any analysis of the effects of hypnosis or even acknowledge its power to distort memory. Most of those cases instead follow Harding's lead, citing it as authority for admission of such testimony, and rely generally on (1) the witnesses' statements that they were testifying from their own recollections, see Kline, supra; Wyller, supra, and (2) the assumption that cross-examination would enable a jury to make an adequate determination as to the credibility of the testimony, see Wyller, supra; Creamer, supra; Brom, supra; Jorgen-

sen, supra." *State v. Mena, id.*, 624 P.2d p. 1276, 77–78.

However, *Mena* has been modified to allow testimony of a witness who has been hypnotized if the subject of the testimony concerns events that were recalled by the witnesses and related to and recorded by the authorities prior to the hypnosis. *State ex rel Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982). This exclusion of testimony by a previously hypnotized witness is because of lack of reliability as measured by acceptance in the scientific community.

The Michigan Court of Appeals has held that hypnotically refreshed recollection renders testimony inadmissible because of lack of reliability as measured by lack of acceptance in the scientific community. *People v. Tait*, 99 Mich.App. 19, 279 N.W.2d 853 (1980).

*People v. Gonzales*, 108 Mich.App. 145, 310 N.W.2d 306 (1981) held testimony about incidents recalled only under hypnosis' inadmissible; and *People v. Wallach*, 110 Mich.App., 37, 312 N.W.2d 387 (1981) held testimony about incidents recalled only after hypnosis inadmissible.

The Minnesota Supreme Court has held that a previously hypnotized witness may not testify in a criminal trial concerning subject matter of a pretrial hypnosis because of lack of reliability as measured by acceptance in the scientific community. *State v. Mack*, 292 N.W.2d 764 (Minn., 1980). *Mack* is of particular interest because of the excellent record before the court. A witness can only testify to matter "previously and unequivocally disclosed by him to authorities prior to hypnosis." *People v. Koehler*, 312 N.W.2d 108, 110 (Minn. 1981).

The Nebraska Supreme Court has held that a witness who has been previously questioned under hypnosis may not testify in a criminal trial concerning subject matter of the pretrial hypnosis because of the lack of reliability as measured by acceptance in the scientific community. *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648 (1981).

The Pennsylvania Supreme Court has held that hypnosis has not gained sufficient acceptance to allow testimony by one who had been hypnotized prior to trial to refresh their recollection. *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981).

Maryland was the first State to allow the use of hypnotically enhanced testimony. *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968). However, Maryland has recently adopted the *Frye* standard and has remanded to the trial court for a ruling as to whether or not hypnosis meets the *Frye* standard. *Polk v. State*, 48 Md.App. 382, 427 A.2d 1041 (1981).

The Supreme Judicial Court of Massachusetts has recently suggested the *Frye* standard and remanded to the trial court for a ruling on whether hypnosis meets that standard:

"It may be that we will conclude, as a matter of law, that no procedures are adequate." (to allow the use of hypnotically enhanced testimony). Footnote: A forceful argument has been made that hypnotically enhanced testimony is not and cannot be reliable and must be excluded as a matter of law. Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Calif.L.Rev. 313 (1980). *Commonwealth v. A Juvenile*, 381 Mass. 727, 412 N.E.2d 339, 343 (1980).

The following cases have also refused to admit hypnotically aided testimony on the grounds of reliability. *People v. Busch*, 56 Cal.2d 868, 16 Cal.Rptr. 898, 366 P.2d 314 (1961); *Rodriquez v. State*, 327 So.2d 903 (Fla.App.) cert. den. 336 So.2d 1184 (Fla. 1976); *Emmett v. State*, 232 Ga. 110, 205 S.E.2d 231 (1974); *People v. Harper*, 111 Ill.App.2d 204, 250 N.E.2d 5 (1969); *State v. Harris*, 241 Or. 224, 405 P.2d 492 (1965); *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974); *Habeas Corpus for Greenfield v. Commonwealth, Greenfied v. Robinson*, 413 F.Supp. 1113 (D.C. Va.1976).

Other cases have simply declared hypnotically testimony inadmissible per se, *e.g., People v. Ebanks,* 117 Cal. 652, 49 P. 1049 (1897); *State v. Pusch,* 77 N.D. 860, 46 N.W.2d 508 (1951); *State v. Pierce,* 263 S.C. 23, 207 S.E.2d 414 (1974).

*State v. Mena, supra; People v. Shirley, supra;* and *Collins v. Superior Court, supra,* have thoroughly explored the scientific communities opinion of the reliability of hypnosis by examining the relevant literature because:

"For this limited purpose (admissibility) scientist have long been permitted to speak to the courts through their published writings and scholarly treatise and journals. (citations omitted). The courts viewed such writings as 'evidence,' not of the actual reliability of the new scientific technique, but of its acceptance vel non in the scientific community. Nor do the courts 'pick and choose' among the writings for this purpose. On many topics—including hypnosis—the scientific literature is so vast that no court could possibly absorb it all. But there is no need to do so, because the burden is on the proponent of the new technique to show a scientific consensus supporting its use; if a fair overview of the literature discloses that scientists significant either in number or expertise publicly opposed that use of hypnosis as unreliable, the courts may safely conclude there is no such consensus at the present time." *People v. Shirley, supra,* 181 Cal.Rptr. at 266, 641 P.2d at 797.

*People v. Shirley, supra,* points out that memory:

"Does *not* act like a video tape recorder, but rather is subject to numerous influences that continuously alter its contents." (emphasis in the original)—and "that memory is productive rather than reproductive." *People v. Shirley, supra,* 181 Cal.Rptr. at 266, 641 P.2d at 798.

In addition:

"The 'video tape recorder' theory of law enforcement hypnotist also lack empirical support for the third of its assumptions, to-wit, that upon being un-locked by hypnosis the witnesses repressed memories are 'replayed' without further modification as he recalls the original event. (footnote 39) (footnote omitted). Once more the research results are otherwise: in this final stage of the process, known as 'retrieval,' the accuracy of the witnesses memory may be adversely effected by outside factors even as he recalls it—

"Lastly, Doctor Loftus warns that there is no clear correlation between the witnesses confidence in the accuracy of his recall and its accuracy in fact: indeed, studies have shown that in some circumstances 'people can be more confident about their wrong answers than their right ones.' " *People v. Shirley, supra,* 181 Cal.Rptr. at 269–70, 641 P.2d at 801.

*Shirley* also points out that:

"1) Hypnosis is by its nature a process of suggestion, and one of its primary effects is that the person hypnotized becomes extremely receptive to suggestions that he perceives as emanating from the hypnotist. The effect is intensified by another characteristic of the hypnotic state, to-wit, that the attention of the subject is wholly focused on and directed by the hypnotist.—

2) The person under hypnosis experiences a compelling desire to please the hypnotist by reacting positively to those suggestion of heightened memory, (hyparticular responses he believes are expected of him. Because of this compulsion, when asked to recall an event either while in 'age regression, or under direct suggestion of heigthened memory, (hyperamnesia)', he is unwilling to admit that he cannot do so or that his recollection is uncertain or incomplete. Instead, he will produce a 'memory' of the event that will be compounded of (1) relevant actual facts, (2) irrelevant actual facts taken from an unrelated prior experience of the subject, (3) fantasized material ('confabulations') unconsciously invented to fill gaps in the story, and (4) conscious lies—all formulated in as realistic

a fashion as he can. (footnote 47) (footnote omitted).—

3) During the hypnotic session, neither the subject nor the hypnotist can distinguish between true memories and pseudomemories of various kinds in the reported recall; and when the subject repeats that recall in the waking state (e.g., in a trial), neither an expert witness nor a lay observer (e.g., the judge or jury) can make a similar distinction.—

4) Nor is such guarantee furnished by the confidence with which the memory is initially reported or subsequently related: a witness who is uncertain of his recollections before being hypnotized will become convinced by that process that the story he told under hypnosis is true and correct in every respect." *People v. Shirley, supra,* 181 Cal.Rptr. at 271–72, 641 P.2d at p. 802–03.

*Collins v. Superior Courts, supra,* drawing on *People v. Mena, supra,* summarizes the unreliability of hypnosis under the following headings:

Suggestion

Confabulation

Incorrect Recall

Purposeful Lying

Undue Weight Given by the Jury

Hypnotic Inducement not Scientifically Reliable

Safeguards cannot Insure Post-Hypnotic Testimony is Reliable

*Collins v. Superior Court, supra,* 644 P.2d p. 1269–1273.

The California Supreme Court provides examples of why safeguards cannot insure reliability and observes "in our opinion, the game (providing adequate safeguards) is not worth the candle." *People v. Shirley, supra,* 181 Cal.Rptr. at 256, 641 P.2d at 787.

Because of the lack of acceptance by the scientific community for the reasons given in *State v. Mena, supra; People v. Shirley, supra;* and *Collins v. Superior Court, supra,* and summarized above, the California Supreme Court's opening for the *Shirley* case should provide a beacon for this court.

"The principal question on this appeal is whether a witness may be allowed to testify after he has undergone hypnosis for the purpose of restoring his memory of the events in issue. The question is new to this court, but has been often litigated in our sister states and extensively studied by medical science. In accord with recent and persuasive case law and the overwhelming consensus of expert opinion, we conclude that the testimony of such a witness should not be admitted in the courts of California." *People v. Shirley, supra,* 181 Cal.Rptr. at 244, 641 P.2d at 776.

As Brown J. and Rose C.J. observed in their dissent to the Wyoming Supreme Court's recent approval of hypnotically refreshed testimony:

"I disagree with the majority's disposition of this case. Stripped of its veneer, this case holds that a police officer who occasionally plays around with hypnotism can manipulate the recall of a witness and receive the blessing of this court.

The admission in evidence of hypnotically enhanced testimony developed by experts is suspect, even under correct scientific procedures. The admission of hypnotically enhanced testimony developed by a rank amateur absent any scientific procedure is totally unreliable.

The majority has totally failed to recognize, or even consider the potential for abuse and the unreliability of hypnotically enhanced testimony.—

—Poorly conceived law usually survives its maker. Its puny existence is sustained mainly by sentiment. I believe that this court will retreat from its holding here. This case should be placed in a museum as an object of interest, but of no value as a precedent." *Chapman v. State,* 638 P.2d 1280, 1286–87, 1992 (Wyo.1982).

a.) Similarity between and lack of reliability of hypnosis, truth serum and polygraph testing noted.

The Washington Supreme Court refused to permit a defense psychiatrist to testify

to statements made by the appellant while under the influence of truth serum in *State v. White*, 60 Wash.2d 551, 374 P.2d 942 (1962) cert. den., 375 U.S. 883, 84 S.Ct. 154, 11 L.Ed.2d 113. The Washington Court relied in part on the reasoning of the California Supreme Court dealing with the inadmissibility of hypnotically induced testimony in *People v. Busch*, 56 Cal.2d 868, 16 Cal.Rptr. 898, 366 P.2d 314 (1961).

The Virginia Supreme Court noted the similarity between hypnosis and truth serum in *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974). The Oklahoma Supreme Court and the Florida Court of Appeals have also noted the similarity. *Jones v. State*, 542 P.2d 1316 (Okl.Crim. 1975); *Rodriquez v. State, supra.*

The Arizona Supreme Court noted the similarity of hypnosis, polygraph tests and truth serums in its recent decision allowing testimony of a witness who has been hypnotized concerning events recollected and recorded prior to hypnosis. *Collins v. Superior Court, supra*, 644 P.2d 1272.

The following observation by the Minnesota Supreme Court is on point.

"It is interesting to note Dr. Orne's testimony that, in his opinion, a witness' testimony to a 'memory' retrieved under hypnosis is 'infinitely less reliable' as an indicator of truth than the results of a polygraph test." *State v. Mack, supra*, 768, footnote 7.

The Nebraska Supreme Court has recited this observation of Doctor Orne. *State v. Palmer, supra*, 313 N.W.2d 655.

The California Supreme Court has noted the similarity between hypnosis and truth serum. *People v. Shirley, supra*, 31 Cal.3d 73, 181 Cal.Rptr. 243, 641 P.2d 775.

b.) Inconsistent lines of cases—excluding the use of hypnotically aided testimony for the defendant and allowing the use of hypnotically aided testimony for the prosecution.

The California Supreme Court has adopted the position of the Minnesota Su-

preme Court expressed in *State v. Mack, supra*, by holding that:

"Summing up, the court recognized but declined to perpetuate the two inconsistent lines of cases discussed hereinabove (Parts II A and II B, ante): 'We follow the best scientific authority, however, in rejecting as artificial and unprincipled any distinction between hypnotically-induced testimony offered by the defense to exculpate and that offered by the prosecution to make its case. Regardless of whether such evidence is offered by the defense or by the prosecution, a witness whose memory has been 'revived' under hypnosis ordinarily must not be permitted to testify in a criminal proceeding to matters which he or she "remembered" under hypnosis.' " *People v. Shirley, supra*, 181 Cal.Rptr. at 258, 641 P.2d at 790.

Fundamental fairness and the constitutional guarantees of due process require that this court do the same.

IV. **The defendant cannot legally be submitted to a second trial.** This part should not be confused with the other aspect of the case, that the majority errs in remanding for a retrial where the State will be unable to make a case without the testimony of Mr. Aldridge and without the testimony of Ms. Boyer. Here a concern which I have voiced to deaf ears is that the district court, acting within its jurisdiction and under the powers vested in district courts by the legislature, has already acted to bring down the curtains on the prosecution of Mrs. Iwakiri—which is undoubtedly viewed by her and by her children and husband as more in the nature of a persecution—and a very expensive experience in the bargain. The kidnapping of which she was charged was not the ransom-type, but merely the allegation tht she was at least a knowledgeable participant in the wrongful seclusion of two children from their parents. Mrs. Iwakiri made a livelihood by babysitting a number of small children, and when pictures of two missing children were published locally, the police were informed

that it was thought that those children had been seen at her home.

After the jury found her guilty, as little else it could do with the admitted testimony of Mr. Aldridge and Ms. Boyer, the district court, in sentencing her to five years, retained 120-day jurisdiction to further consider her case, as is allowed by I.C. § 19–2601(4). The majority opinion notes that within that four month period the district court removed her from custody and placed her on probation, and notes also that her conviction was later reduced to a misdemeanor. The majority opinion would leave the impression that Mrs. Iwakiri is still on probation, and will now have to endure a retrial. This is misleading. On recommendation of the Senior Probation Office, and there being no objection registered from the prosecutor's office, she was completely discharged and released from probation on January 26, 1983, by order of Judge Newhouse. It was in this same order that Judge Newhouse reduced the conviction from a felony to a misdemeanor— which the majority does note. But, what the majority refuses to put in its opinion is that the same order also reduced her sentence from five years indeterminate to the 120 days which Mrs. Iwakiri had already served in confinement at the time she was placed on probation! All of this was done under the provisions of I.C. § 19–2604, enacted in 1970, and not only did the State not object to Judge Newhouse's leniency, but it has not appealed from it. What this means is that on January 26, 1983, Mrs. Iwakiri, for the debt she owed society under the conviction which this Court today reverses, has nonetheless fully paid the penalty imposed upon her. And yet, the majority declares that it is sending her case back for a new trial. This should indeed startle the district judge who turned her completely free now well over a year ago.

A correct decision from this Court is undoubtedly a most important item in Mrs. Iwakiri's life. Her appeal was not brought in order that the Court have the opportunity to manufacture a new rule for the future, but to vindicate and eradicate a kidnapping conviction. The four months of confinement cannot be erased nor remedied unless benevolent legislators would decide that there may be occasions when victims of criminal prosecution should be compensated.

All five members of the Court are agreed that her conviction cannot stand. All that her appeal could have gained for her was the overturning of her conviction of kidnapping two little children, which charge she has at all times denied. Mrs. Iwakiri heretofore eked out her living by babysitting children, but since her conviction she has had to turn to doing housework for others. The trial judge who presided at her trial, and was faced with making two crucial and difficult rulings on the admission of evidence, and as could often happen, committed error. That judge has since declared satisfied the debt that she did not owe, which was paid with a successful probation and 120 days of incarceration.

For whatever reason, and the only reason surfacing is the Court's formation of a new rule in this case rather than in *Bainbridge,* the Court refuses to make note that she has paid her dues in full for an erroneous conviction. Instead, it declares to the whole world that that new rule can be used at her retrial on the kidnapping charge—a trial which everyone knows will never take place.

How can I but respectfully dissent?